640 A.2d 934

COMMONWEALTH of Pennsylvania, Appellee,

v.

Theresa FERINO, A/K/A Delores Cullin, Appellant.

Superior Court of Pennsylvania.

Submitted Dec. 6, 1993.

Filed April 14, 1994.

Steven R. Tabano, Pittsburgh, for appellant.

Kemal A. Mericli, Sandra Preuhs, Asst. Dist. Attys., Pittsburgh, for Com., appellee.

Before KELLY, POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

We are asked to review the judgment of sentence (1–2 years imprisonment, to be followed by a consecutive term of 4 years probation) for ethnic intimidation and terroristic threats by the appellant, Theresa Ferino, a/k/a Delores Cullin. We reverse.

Viewing the evidence in a light most favorable to the verdict-winner, as well as all reasonable inferences to be drawn therefrom, it appears that at approximately 3:00 a.m. on the 31st day of July, 1992, Emmitt Harris (a 20–year–old black male) and his friend of some 3 years Matthew Chapman (a 17–year–old white male) arrived at the Arlington Deli on the South Side of Pittsburgh.

The Deli had closed at 9:00 p.m. and Harris, as the nighttime stock boy, had asked Chapman to assist him in cutting boxes and depositing the refuse in the dumpster in the rear of the establishment. After the two had disposed of a number of the boxes, the two were en route to the dumpster when the appellant was observed "walking up towards" them. Both had seen her patronizing the Deli and Harris knew her as a resident of the area.

As the appellant walked toward Harris and Chapman, and at a distance of about 50 yards, she extended her arms and said: "I'm going to kill you, you f—king nigger, and fired two shots." Nothing was said by Harris or Chapman to the

appellant prior to or after the shooting. The two were so frightened that they ran into the Deli and phoned "911". More specifically, the events during the vocalization of the appellant's statement were described by Harris as follows:

> She [the appellant] was holding a gun and like taking steps towards *us*, coming—like she was coming up the street towards the deli, and she fired two shots. *Me and Matt ran back into the store.*[1] [Emphasis added]

The police arrived within 30–45 minutes of the call and found the appellant in the street. However, no arrest was made of the appellant at that time. Rather, it was not until Harris phoned Pittsburgh police officer Gerald Watkins during the 1st week of August, 1992, out of which a report was filed and forwarded to Watkins, that he and Chapman were interviewed, a complaint was filed and a search warrant was issued on August 12th leading to the seizure of a .38 caliber Taurus handgun from the appellant's residence (located 5–6 houses away from the Deli).[2] Her arrest occurred on the same day as the search of her premises.

At the non-jury trial before the Honorable James F. Clarke, Harris' account of what transpired was corroborated by Chapman. For example, Chapman testified that the appellant "was walking towards us ... and holding the gun" when she made the threatening remark. Chapman also indicated that the appellant "point[ed] the gun" before firing it, but he did not state at whom the weapon was aimed. Yet, Chapman, as well as Harris, became "scared" and "darted" back into the store. Further, like Harris, Chapman disclosed that he had seen the appellant in the Deli, but he never had any problems with

---

1. On cross-examination, Harris indicated that the appellant fired the weapon at him, but he could not recall whether one or two shots had been fired. The judge (sitting as the trier-of-fact) concluded that 2 shots had been fired at Harris. This prompted Chapman as well as Harris to run into the Deli and call police.

2. Harris testified to going to No. 3 police station in Pittsburgh to file an incident report the night of the shooting, but, allegedly, he was told by an officer Reed "that he's not taking a police report, to get out of his face, and that [Harris] should have got[ten his] head blown off."

her.[3]

After the Commonwealth rested, the appellant took the stand and denied ever brandishing or firing a weapon at Harris or calling him a "nigger". In fact, it was the appellant's contention that she was sitting with a "neighborhood watch" group next door to her home during the period preceding the arrival of the police. This was buttressed by 3 of her neighbors (Maumann, Carney & Weidenhof) and the person with whom she shared her home (McCoy). She left the trio only to obtain a drink from her home, and, when she exited her premises, two police officers confronted her for questioning. She denied any involvement in the incident.

At the close of testimony, the appellant was found guilty of ethnic intimidation and terroristic threats. Post-trial motions were filed, denied and sentencing followed. A motion to withdraw by trial counsel was granted and new counsel, unassociated with prior counsel, was appointed. This appeal ensued raising questions concerning the sufficiency and weight of the evidence, as well as a claim that trial counsel was ineffective.

On the ethnic intimidation charge, the statute defines the offense thusly:

(a) Offense defined.—A person commits the offense of ethnic intimidation if, with malicious intention toward the race, color, religion or national origin of another individual or group of individuals, he commits an offense under any other provision of this article or under Chapter 33 (relating to arson, criminal mischief and other property destruction) exclusive of section 3307 (relating to institutional vandalism) or under section 3503 (relating to criminal trespass) or under section 5504 (relating to harassment by communication or address) with respect to one or more members of such group or their property.

\* \* \* \* \* \*

3. Harris testified to never having any problems with the appellant before the July 31st shooting. Although Harris did offer, without elaboration, that the appellant and his boss (Anthony Falvo) "had problems."

(c) Definition.—As used in this section "malicious intention" means the intention to commit any act, the commission of which is a necessary element of any offense referred to in subsection (a) motivated by hatred toward the race, color, religion or national origin of another individual or group of individuals.

18 Pa.C.S.A. § 2710(a), (c).

It is the appellant's contention that she was charged with ethnic intimidation merely because she used the word "nigger" during the shooting. According to the appellant, to uphold her conviction on this charge would be to "criminalize the use of a particular word, even [though] used while in the commission of a crime." She would have us focus on the "crime itself" in determining whether it was racially motivated. By doing so, she argues, the evidence "clearly showed that the crime could only have been committed as the result of ill will between the neighbors and the black victim and his white employer. Therefore, the evidence was insufficient to show that the purported crime was directed at the victim because he was black. Without more than the use of the word 'nigger' ..., the evidence was insufficient in law to prove beyond a reasonable doubt that the appellant was guilty of the crime of which [s]he stands convicted." Appellant's Brief at 9–10. We disagree with the substance but not with the result of the appellant's argument.

In *Commonwealth v. Rink,* 393 Pa.Super. 554, 574 A.2d 1078 (1990), allocatur denied, 526 Pa. 654, 586 A.2d 922 (1991), in the only other case to date to reach the appellate courts on the charge of ethnic intimidation, this Court affirmed the judgment of sentence.

In *Rink,* the victim, his wife and four children were the only black individuals living in the lower Frankford section of the City of Philadelphia for 2 years. During this time there had been no incidents of racism against the victim or his family. As recounted by the *Rink* Court, the facts were as follows:

On November 6, 1987, at about 10:00 P.M., Mr. Snow was driven home by his friend Al Bendzynski, a co-worker, with

whom he intended to share the six pack of beer he had brought home with him. There was a crowd of teenagers across the street in front of the Snow residence playing a radio loudly. Mr. Snow asked them to hold the noise down. Moments after entering his home, Mr. Snow heard a knock at the front door. The group of teenagers was now at his front steps. Believing his wife and children to be asleep upstairs, he shut the door behind him to confront the knocker. A two-by-four hit him at the thigh, knocking him off the step. Armed with sticks, the crowd of about sixteen or seventeen white youths then started to pummel him on the arms, head, and body. They threw objects at his home, breaking windows. Appellant was urging the group to "kill the nigger; get him."

When Mrs. Snow came to the door, her husband was on the ground surrounded by a group of young white males, wielding two-by-fours, some holding on to her husband, others tossing beer bottles at them and the house, cussing, yelling that they hated niggers, and "kill a couple of . . . niggers." Prominent in the group, holding a board and urging the group to "kill the niggers" was the appellant. The appellant punched Mrs. Snow and called her a "bitch" and "nigger." The crowd of youths disbursed as the police arrived on the scene. At the end of it all, Mr. Snow was bleeding, suffering from contusions of arms, legs, and body. The housefront was in shambles with both first and second floor windows shattered including the windows of the living room located six feet behind the porch windows.

393 Pa.Super. at 557, 574 A.2d at 1080. After the appellant's conviction, an appeal was perfected and he challenged, inter alia, the sufficiency of the evidence as to ethnic intimidation and the court sentencing him on two charges of ethnic intimi- dation. In finding the claims to be meritless, this Court noted that the appellant had denied that the incident was racially motivated. It was the appellant's position that the victim's co- worker (Mr. Bendzynski) had engaged in a friendly discussion with the appellant's group, but upon leaving Bendzynski "pat- ted" one of the teenagers on the cheek. This offended the

youth and prompted the person to go to the victim's home and seek an apology from Mr. Bendzynski.

We acknowledged that there was evidence on the record supportive of the appellant's version of the events. However, we found "overwhelming" evidence that the victim, and not Mr. Bendzynski, was the object of the teenagers' wrath. For example, in addition to the victim and his wife being assaulted, their home was extensively vandalized. Yet, if one were to believe the appellant's view of the disgruntled teenager seeking retribution from Mr. Bendzynski, amazingly Mr. Bendzynski and his vehicle (situated outside the victim's home) remained unscathed in the assault. Even Mr. Bendzynski conceded at trial that "the teenagers did not seem to want him, but were after [the victim]." Further, no other slurs were directed at Mr. Bendzynski. Rather, they were aimed *directly* at the victim and his wife. As such, this Court dismissed the appellant's claim that the ethnic epithets were not racially motivated and the product of emotionally charged behavior.

Instantly, unlike in *Rink,* we had the use of a *single racial word* preceding the discharge of a weapon in the direction of not only Harris but his white companion (Chapman) as well. This behavior by the appellant was sufficiently intimidating that it "frightened" Chapman as well as Harris to flee the scene in *tandem* to seek the safety and security of the Deli.

It is to be recalled that both Harris and Chapman were consistent in their accounts painting a picture of the appellant as someone *walking toward the two,* with arms outstretched and weapon in hand, but neither testified at whom the weapon was directed either prior to, during or after the shooting.

We, as an appellate court, do not sit in a position of substituting our judgment for that of the finder-of-fact in matters of credibility, a role prohibited for us to undertake as an invasion of the credibility-finder's bailiwick—in this case it was the judge in a bench trial. See *Commonwealth v. Mudrick,* 510 Pa. 305, 507 A.2d 1212, 1213 (1986), quoting *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982), cert. denied, 460 U.S. 1043, 103 S.Ct. 1440, 75 L.Ed.2d 797 (1983)

("When reviewing the sufficiency of the evidence, an appellate court may not substitute its judgment for the [trier-of-fact's].").[4]

Our role, as stated previously, is to view the evidence in a light most favorable to the verdict winner, drawing all reasonable inferences in its favor, to determine if the finder-of-fact could reasonably have concluded that all the elements of the crime were established beyond a reasonable doubt. *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818 (1989).

Initially, reading Section 2710 in a commonsense fashion, so as to give effect to all of its provisions as intended by the Legislature (see 1 Pa.C.S.A. § 1921), an offense needs to be committed under the Crimes Code (which in this case is terroristic threats). In the course of effectuating the commission of such a crime, the actor must manifest a malicious intent toward the intended victim and have as its motivation the hatred of the victim's "race, color, religion or national origin." Section 2710(a), (c).

 Instantly, it cannot be disputed that, viewed in a vacuum (i.e., without the utterance directed as Harris' race), the appellant's aiming and firing a weapon at and in the direction of Harris would not have taken on the prohibited conduct of ethnic intimidation. Neither do we believe that the line of criminality proscribed by Section 2710 was crossed when the appellant aimed and fired a weapon *in the direction of Harris and Chapman* preceded by the threat ("I'm going to kill you, you f—king nigger"). This was insufficient to evidence an intention malicious in nature and having as its origin racial prejudice which evoked or was the underlying cause for

---

**4.** We may not speculate as to the substance of Harris' reference to some type of discord or friction between the appellant and Harris' employer (Anthony Falvo) since the court, as the trier-of-fact, made no mention of the same in its account of the facts it chose to believe.

It may be observed that the appellant's testimony of Harris' presence at the Deli being detected because of his use of an alarm system to secure his vehicle (a "beeping" sound indicated that it had been activated) was made reference to by the court as "loud and disturbing noises ... [of] frequent occurrences at a time of early morning and a source of disturbance and annoyance to all nearby neighbors." Trial Court Opinion at 3.

the prohibited behavior. In other words, the singularity of the act committed by the appellant, directed as it was against both Harris and his companion (a Caucasian), the antecedent of which was neither a harsh word, gesture nor conduct exhibited between the victim and the appellant, we do not believe rises to the proof-level sufficient to constitute a contravention of the ethnic intimidation statute. Stated otherwise, the appellant's conduct was isolated in nature, brief in its execution and unattended by any trappings consistent with a finding that the terroristic threat had an origin of malicious intent "motivated by a hatred toward race, color . . . or national origin" of the victim. Contrast *Commonwealth v. Rink*, supra, wherein the ethnic epithets were accompanied with multiple assaults upon the victim and his wife, property damage to their home, all the while the alleged object of the affray and his property survived unscathed and unapproached by the appellant and his cohorts.

■ Therefore, based on the unique facts at bar and for the reasons stated herein, we fail to discern such a malevolence on the part of the appellant *directed specifically* at the victim *because of his race* to justify an affirmance of the judgment of sentence for ethnic intimidation. However, without extended discussion, we hold the evidence (both in quality and quantity) to be sufficient to sustain the verdict of guilty of terroristic threats so as to discount the appellant's claim that a new trial is imperative. See generally *Commonwealth v. Burton*, 450 Pa. 532, 301 A.2d 599 (1973); *Commonwealth v. Murray*, 408 Pa.Super. 435, 597 A.2d 111 (1991) (en banc), allocatur denied.

■ The last of the appellant's complaints assigns trial counsel with ineffectiveness in failing to call the police officers who initially investigated the shooting on the evening in question on the basis that their testimony was "vital" to determining the credibility of Harris and Chapman. More specifically, the appellant avers that:

The evidence these police officers would have produced includes whether shell casings or bullet holes were found at

the scene, the emotional state of the actor[ ], and why they felt a report did not need to be filed nor anyone arrested.

Appellant's Brief at 11. Inasmuch as the appellant's contention deals with the terroristic threat conviction, our ruling that the evidence was insufficient to sustain the ethnic intimidation charge, requires that we address the ineffectiveness of counsel argument.

To assess a claim of ineffectiveness of counsel for failure to call or interview possible witnesses, a defendant must establish (1) the identity of the witnesses; (2) that counsel knew of their existence; (3) that the evidence to be elicited from the witnesses would have been material; and (4) the manner in which the absent witnesses would have been helpful to the case. *Commonwealth v. Glessner,* 337 Pa.Super. 140, 486 A.2d 521, 524 (1985).

Our examination of the appellant's defense discloses a scenario in which 3 neighbors and a roommate placed her in their company immediately preceding the arrival of the police at the scene—alibi defense. Consequently, we fail to understand the materiality of having the police officers appear and testify to their failure to locate any shells at the scene or why the appellant was not arrested or her emotional state, all of which relates to matters occurring *after* the shooting testified to by Harris and Chapman.

We find that the evidence of guilt (as to the identity of the appellant as the perpetrator) related to a point in time prior to the arrival of the police sought to be produced by the appellant to bolster her credibility (and undermine Harris' and Chapman's). As such, the crux of the case being a question of credibility as to the only remaining charge of terroristic threats, which the trial court addressed in its opinion, we cannot fault trial counsel for failing to secure the production of the officers at trial.

Finding the ineffectiveness of counsel claim lacking in arguable merit, we will not label trial counsel inept for failing to do a meritless act. *Commonwealth v. Marsh,* 388 Pa.Super. 610,

566 A.2d 296, 302–303 (1989); *Commonwealth v. Flis,* 369 Pa.Super. 275, 535 A.2d 157, 160 (1987).

Consistent with our determination that the evidence was insufficient to sustain the conviction for ethnic intimidation, we reverse the judgment of sentence for such offense and let stand the conviction for terroristic threats. However, we remand for re-sentencing on the conviction for terroristic threats since it appears that the sentencing format of the court below may have been compromised with our reversal of the ethnic intimidation conviction. The linkage of the two offenses may have prompted the court to impose a probationary term of 4 years for the terroristic threats conviction because a prison term had already been assigned to ethnic intimidation. Thus, the court below should be given the occasion to alter a sentence imposed as a unit to achieve its sentencing scheme. See *Commonwealth v. Kotz,* 411 Pa.Super. 319, 601 A.2d 811 (1992).

Judgment of sentence reversed; case remanded for a *procedendo* made reference to herein; jurisdiction is relinquished.

KELLY, J., concurs in the result.