858 A.2d 1259 (2004)
In re M.J.M., A Minor.
Appeal of M.J.M., A Minor.
Superior Court of Pennsylvania.
Submitted May 10, 2004.
Filed September 15, 2004.
*1260 John A. Fielding III, Reading, for appellant.
Douglas J. Waltman, Assistant District Attorney, Reading, for Commonwealth, appellee.
Before: LALLY-GREEN, GANTMAN, and KELLY, JJ.
OPINION BY LALLY-GREEN, J.:
¶ 1 Appellant, M.J.M., appeals from the trial court's October 17, 2003 order of disposition. We affirm.
¶ 2 The trial court recited the following facts and procedural history:
On August 19, 2003, the court found that the juvenile, M.J.M., had committed, beyond a reasonable doubt the acts of harassment, 18 Pa.C.S.A. § 2709(a)(3), and ethnic intimidation, 18 Pa.C.S.A. § 2710(a), and adjudicated the juvenile a delinquent. The court deferred disposition until October 17, 2003. M.J.M. appeals the adjudication. This Opinion is filed pursuant to Pa.R.A.P. 1925. The following are the pertinent facts.
On April 8, 2003, at 7:30 a.m. Hispanic twin brothers, Alexander and Anthony, were riding a public school bus en route to school. They are fourteen years old and in seventh grade. They were the only Hispanics on the bus that day. Due to past verbal abuse and insults *1261 from the juvenile, the brothers' parents had told them to sit in the front of the bus behind the driver. Last year the twins and the juvenile had gotten into a fight on the bus due to the juvenile's comments about ethnicity. On this day the brothers were sitting behind the bus driver as their parents had requested.
Three boys, Tyler, Andy, and Andrew, were sitting at the back of the bus. The juvenile boarded the bus after the brothers and joined the other three boys at the back of the bus. The juvenile sat on the last seat on the driver's side.
Alexander testified that the bus had been quiet and he had been able to hear the juvenile talking. The juvenile had made the following remark about the brothers' parents. "Your parents are only here for the 15th and 30th, pay-day." The juvenile had referred to Alexander's name when he had spoken. After Alexander had heard the remark, he testified that he had felt "Like my heart stopped." Transcript, August 19, 2003, p. 19. Alexander did not hear any other part of the juvenile's conversation because the juvenile had then lowered his voice.
Alexander told the bus driver and his parents about this incident. The bus driver did nothing about it. Several witnesses testified to the good rapport shared by the bus driver and the juvenile.
The juvenile and the brothers rode the school bus after school on that same day. They sat in the same seats as they had earlier on the trip to school. During this ride Alexander heard the juvenile state that all Puerto Ricans had small "dicks." The juvenile was also shooting tampons by putting them in his mouth. One of the plastic tubes landed on Alexander's lap.
Anthony heard the juvenile's remarks made in the morning on the bus about Puerto Ricans, including the remark that his family should go back to Puerto Rico. He did not hear the juvenile's remark concerning small penises. However, another student told him about it. When Anthony then looked at the juvenile, the juvenile looked at Anthony and smiled.
Tyler is fifteen years old. He testified that the juvenile had spoken in a volume loud enough for other people to hear.
The twins' father testified. The court notes that he is gainfully employed as a criminal investigator for the Reading Police Department. His children had informed him about the incidents on April 8, 2003. He also knew of approximately five other incidents concerning the juvenile and the boys. In the past the father had tried to resolve the problems by calling school personnel and having his sons sit up front near the bus driver to get away from the juvenile. He also had his attorney send two letters to the juvenile's parents. Nothing resulted from the letters.
Andy and Andrew are the juvenile's friends who were on the bus in the morning. They testified that the juvenile had not mentioned the brothers' surname when he had made the remark about Puerto Ricans and that he talked in a normal tone of voice.
The bus driver testified that on the day of the incident she had not heard any comments about Puerto Ricans and had not seen any tampons being shot around, although she had found one at the end of the day. She denied that the juvenile shares a better relationship with her than the other children do. She stated that she treats all the students the same.

*1262 M.J.M. is sixteen years old. He testified that the tenor of his conversation on April 8, 2003, had been about "patriotism". He had stated that Puerto Ricans are only proud to be Americans on the 15th and 30th of the month. The juvenile believed that people receive their welfare checks on those dates. He had made the remark as a "joke". He further testified that he had not intended that the brothers should hear the remarks. He had already been warned about having conversations with them. He denied making the comment about Puerto Ricans' penises.
The juvenile further testified that others had shot tampons before he had done so. His tampons had not gone very far.
The officer who investigated the bus incident did not receive a tape although tapes are supposed to be used daily on the bus. He was informed by school personnel that there was no tape available for the day of the incident because either the camera had not worked or something had been wrong with the tape itself because the tape was blank.
Based on the foregoing testimony the court found that the juvenile had committed the aforesaid acts.
Trial Court Opinion, 12/11/03 at 1-4.
¶ 3 Appellant raises the following issues for our review:
Did not the trial court err in finding the evidence sufficient to support its adjudication of delinquency, when the testimony established that any statements made by the minor were not threats or intimidation nor directed to or heard by the alleged victims. Furthermore, did not the court err in dismissing the Appellant's motion to dismiss based on these facts as a violation of the minor's right of free speech as protected by Article 1, Section 7 of the Pennsylvania Constitution and by the United States Constitution?
Appellant's Brief at 5.[1]
¶ 4 The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. Commonwealth v. Vetrini, 734 A.2d 404, 406-07 (Pa.Super.1999). Additionally, it is not the role of an appellate court to weigh the evidence or to substitute our judgment for that of the factfinder. Id. When the court is sitting as the finder of fact, it is presumed that inadmissible evidence is disregarded and that only relevant and competent evidence is considered. Commonwealth v. Gonzales, 415 Pa.Super. 564, 609 A.2d 1368, 1371 (1992).
¶ 5 Our statutes define the offense of ethnic intimidation as follows:
§ 2710. Ethnic intimidation
(a) OFFENSE DEFINED.  A person commits the offense of ethnic intimidation if, with malicious intention toward the actual or perceived race, color, religion, national origin, ancestry, mental or physical disability, sexual orientation, gender or gender identity of another individual or group of individuals, he commits an offense under any other provision of this article or under Chapter 33 (relating to arson, criminal mischief and other property destruction) exclusive of section 3307 (relating to institutional vandalism) or under section 3503 (relating *1263 to criminal trespass) with respect to such individual or his or her property or with respect to one or more members of such group or to their property.
...
(c) DEFINITION.  As used in this section "malicious intention" means the intention to commit any act, the commission of which is a necessary element of any offense referred to in subsection (a) motivated by hatred toward the actual or perceived race, color, religion or national origin, ancestry, mental or physical disability, sexual orientation, gender or gender identity of another individual or group of individuals.
18 Pa.C.S.A. § 2710.
¶ 6 "Ethnic intimidation is by its explicit terms a contingent crime, proof of which is dependent upon the establishment of a predicate crime." Commonwealth v. Magliocco, 806 A.2d 1280, 1285 (Pa.Super.2002). In the instant matter, the trial court found that Appellant committed the predicate crime of harassment. 18 Pa.C.S.A. § 2709(a)(3). That section provides as follows:
§ 2709. Harassment
(a) OFFENSE DEFINED.  A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:
...
(3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;
...
(f) DEFINITIONS.  As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
...
"Course of conduct." A pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct. Acts indicating a course of conduct which occur in more than one jurisdiction may be used by any other jurisdiction in which an act occurred as evidence of a continuing pattern of conduct or a course of conduct.
18 Pa.C.S.A. § 2709.
¶ 7 This Court applied § 2709 in Commonwealth v. Lutes, 793 A.2d 949 (Pa.Super.2002). We explained that a course of conduct can be based on words alone, and that intent to harass may be inferred from the totality of the circumstances. Id. at 961. The facts were as follows:
[Defendants] blocked the victim's path into the courthouse. [Defendant] Lutes approached the victim, poked him in the chest with his finger and called him a "p*ssy." [Defendant] Haggerty told the victim that he would take the victim around the corner and beat him. [Defendant] Lutes than [sic] reiterated his previous sentiment and threatened to punch the victim in the mouth. The victim testified that he felt [defendants] were forcing a confrontation, and that he repeatedly requested that [defendants] not touch him. The victim had to back away from [defendants].
Id. at 961. We concluded that the defendants' actions constituted a harassing course of conduct within the meaning of § 2709(a)(3). Id.
¶ 8 The ethnic intimidation statute has been the subject of few reported opinions. In Commonwealth v. Rink, 393 Pa.Super. 554, 574 A.2d 1078 (1990), we upheld a conviction under § 2710 where the defendant participated with a group of teenagers in the beating of a black male in front of the black male's residence. During the incident, the defendant was heard urging the group to "kill the nigger; get him." Id. at 1080. The defendant also punched *1264 the victim's wife and called her "bitch" and "nigger." Id. This Court concluded that the defendant's remarks were racially motivated and not the result of emotionally charged behavior. Id. at 1081. We affirmed the conviction under § 2710.
¶ 9 In Commonwealth v. Ferino, 433 Pa.Super. 306, 640 A.2d 934, 935 (1994), on the other hand, the defendant shouted: "I'm going to kill you, you f____king nigger" and then fired a gun at the victim. This Court concluded that the defendant's threat did not constitute sufficient evidence that racial prejudice was the "underlying cause for the prohibited behavior." Id. at 938. We explained that "the [defendant's] conduct was isolated in nature, brief in its execution and unattended by any trappings consistent with a finding that the terroristic threat had an origin of malicious intent `motivated by a hatred toward race, color ... or national origin' of the victim." Id.[2]
¶ 10 The record in the instant matter, read in a light most favorable to the Commonwealth as verdict winner, reflects the following. On April 8, 2003, on the bus rides both to and from school, Appellant made derogatory remarks regarding Puerto Ricans. Though Appellant was not speaking directly to the victims when he made these remarks, he spoke loud enough to be heard across the bus. The victims were the only two Puerto Ricans on the bus. Both victims heard the remarks Appellant made on the morning bus ride. One of the victims heard Appellant's remarks on the afternoon bus ride and the other did not. Appellant had a history of belittling the victims' ethnicity. One such incident resulted in a fight between Appellant and the victims.
¶ 11 We conclude that, under the totality of the circumstances, sufficient evidence exists to establish beyond a reasonable doubt that Appellant made his remarks with the intent to harass, annoy, or alarm the victims. Moreover, incidents on both the morning and afternoon bus rides are sufficient to constitute a course of conduct within the meaning of § 2709. Lutes. Thus, the record contains sufficient evidence to sustain the adjudication for harassment.
¶ 12 We further conclude that Appellant committed the harassment with malicious intention toward the victims' ethnicity. Appellant's comments, as recited in the trial court's opinion, reflect a clear animosity towards Puerto Ricans. Unlike Ferino, the record in the instant matter reflects that racial prejudice was the underlying cause of Appellant's harassing comments. Appellant's comments were not off the cuff remarks uttered during the commission of a crime, as was the case in Ferino. The separate incidents on the morning and afternoon bus rides, as well as Appellant's history of intolerance toward the victims, are sufficient evidence that Appellant's prejudice toward Puerto Ricans motivated the harassment. Therefore, the evidence is sufficient to sustain the adjudication under § 2710.
¶ 13 Appellant seeks to avoid this result by arguing that § 2710 deprives him of the right to freedom of speech that is guaranteed him under the First Amendment of the United States Constitution and Article I, § 7 of the Pennsylvania Constitution. Appellant argues that the statute is overbroad, void for vagueness, and/or unconstitutional as applied.
¶ 14 Our Supreme Court has recognized that "there is a strong presumption in the law the legislative enactments *1265 do not violate the constitution." Commonwealth v. Mayfield, 574 Pa. 460, 832 A.2d 418, 421 (2003). Appellant faces a "heavy burden" in overcoming this presumption. Id. "A statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution; all doubts are to be resolved in favor of a finding of constitutionality." Id. A statute is unconstitutionally overbroad if "by its reach it punishes a substantial amount of constitutionally-protected conduct." Moreover, "[t]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Id. at 422.
¶ 15 None of the reported appellate jurisprudence regarding § 2710 addresses its constitutionality.[3] The United States Supreme Court has given the following guidelines relevant to our disposition of this issue:
The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid. From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. We have recognized that the freedom of speech referred to by the First Amendment does not include a freedom to disregard these traditional limitations. Our decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation, and for obscenity, but a limited categorical approach has remained an important part of our First Amendment jurisprudence.
We have sometimes said that these categories of expression are not within the area of constitutionally protected speech, or that the protection of the First Amendment does not extend to them. Such statements must be taken in context, however, and are no more literally true than is the occasionally repeated shorthand characterizing obscenity as not being speech at all. What they mean is that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.)  not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government.
R.A.V. v. City of St. Paul, 505 U.S. 377, 382-84, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1991) (citations and internal quotations omitted).
¶ 16 The United States Supreme Court has upheld a statute similar to § 2710. In Wisconsin v. Mitchell, 508 U.S. 476, 480, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), the defendant challenged the constitutionality of a Wisconsin statute providing enhanced sentences where the defendant chose the *1266 victim because of "race, religion, color, disability, sexual orientation, national origin or ancestry. . ." The Court explicitly noted that penalty enhancement statutes, such as the one at issue in Mitchell, are "analogous" to bias-motivated offenses, such as § 2710. Id. at 484, n. 4, 113 S.Ct. 2194. Thus, we consider the constitutionality of § 2710 in light of the analysis in Mitchell.
¶ 17 The Mitchell Court held that choosing a victim based on race is conduct that falls outside of the range of expressive conduct that the First Amendment protects. Id. at 487, 113 S.Ct. 2194. The Court explained that bias-motivated crime is thought to produce significant societal harms, such as retaliatory crimes, emotional distress for the victim, and societal unrest. Id. at 487-88, 113 S.Ct. 2194. "The State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases." Id. at 488, 113 S.Ct. 2194.
¶ 18 The Mitchell Court distinguished R.A.V., supra. The Mitchell Court explained that in R.A.V., it struck down a statute aimed at a particular type of expression (a certain class of "fighting words" that the city deemed to be particularly offensive). Id. at 487, 113 S.Ct. 2194. The Mitchell Court reasoned that, unlike the statute at issue in R.A.V., the penalty-enhancing statute does not punish bigoted thought. Rather, it enhances the punishment for illegal conduct where the victim is chosen on account of his or her ethnicity: "whereas the ordinance struck down in R.A.V. was explicitly directed at expression (i.e., "speech" or "messages"), the statute in this case is aimed at conduct unprotected by the First Amendment." Id. at 487, 113 S.Ct. 2194 (internal citation omitted).
¶ 19 The Mitchell Court also rejected the defendant's overbreadth argument. The First Amendment may render a statute unconstitutionally overbroad where the statute has a chilling effect on free speech. As concerns an ethnic intimidation statute such as § 2710, the argument is that the statute may have a chilling effect in that people will not speak their mind on ethnic issues for fear that their remarks will be used against them in the event they are accused of committing a predicate offense. The Mitchell Court rejected this contention:
We are left, then, with the prospect of a citizen suppressing his bigoted beliefs for fear that evidence of such beliefs will be introduced against him at trial if he commits a more serious offense against person or property. This is simply too speculative a hypothesis to support Mitchell's overbreadth claim.
Id. at 489, 113 S.Ct. 2194.
¶ 20 We believe that the Mitchell Court's reasoning applies with equal force in the instant matter. We must presume that § 2710 is constitutional. Section 2710 clearly proscribes conduct not protected under the First Amendment, and the remote possibility that § 2710 will have a chilling effect on the expression of bigoted beliefs is insufficient to overcome the presumption of constitutionality. Moreover, as the Mitchell Court pointed out:
The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.
Id. at 489, 113 S.Ct. 2194. We reject the argument that § 2710 is unconstitutionally overbroad. Appellant does not distinguish *1267 between the application of the First Amendment and Article I, § 7 of the Pennsylvania Constitution. We believe the result is the same under either constitution.
¶ 21 We next address Appellant's argument that § 2710 is void for vagueness. As noted above, a statute is void for vagueness if it is worded in such a way that ordinary people could not understand what conduct is prohibited. Section 2710 makes it illegal to commit certain predicate offenses "with malicious intention toward the actual or perceived race, color, religion, national origin, ancestry, mental or physical disability, sexual orientation, gender or gender identity of another individual or group of individuals." Pa.C.S.A. § 2710(a). The predicate offenses are explicitly defined elsewhere. Malicious intention is explicitly defined in § 2710(c). We fail to see how ordinary persons of reasonable intelligence would differ as to the nature of the proscribed conduct. See, e.g. Commonwealth v. Moss, 852 A.2d 374 (Pa.Super.2004) (statute criminalizing use of a communications facility in connection with a predicate offense not void for vagueness). Section 2710 is not unconstitutionally vague.
¶ 22 Finally, we address Appellant's argument that § 2710 is unconstitutional as applied in this instance. We turn once again to this Court's opinion in Lutes. In determining whether to uphold a disorderly conduct conviction for calling the victim a vulgar name and threatening to punch him, we quoted the following language:
There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting, or `fighting' wordsthose by which their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are of no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. `Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'
Lutes, 793 A.2d at 962, quoting, Commonwealth v. Mastrangelo, 489 Pa. 254, 414 A.2d 54, 58 (1980) (emphasis added). In the instant matter, Appellant's comments, as quoted above, were precisely the sort of personal abuse that has never enjoyed constitutional protection. In short, Appellant is not being punished because of his opinions; rather, he is being punished because he committed harassment and the record clearly indicates that he chose his victims because of their ethnicity. Appellant's constitutional arguments fail.
¶ 23 In summary, we have concluded that the record contains sufficient evidence to sustain Appellant's adjudications for harassment and ethnic intimidation. We have concluded that the ethnic intimidation statute is constitutional, both on its face and as applied. Accordingly, we affirm the order of disposition.
¶ 24 Order affirmed.
NOTES
[1] Appellant timely filed a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P.1925, preserving these issues.
[2] Our Supreme Court, being evenly divided, affirmed Ferino in a per curiam order. Commonwealth v. Ferino, 540 Pa. 51, 655 A.2d 506 (1995).
[3] The Delaware County Court of Common Pleas, in a well-reasoned opinion, concluded that § 2710 passes constitutional muster. Commonwealth v. Mitchell, 21 Pa. D. & C. 4th 561 (1993).