**STATE of Delaware, Plaintiff,**

v.

**Joshua ANDREWS [1], Defendant.**

**C.A. No. 0511007684.**

Family Court of Delaware,
Sussex County.

Submitted: April 28 and May 17, 2006.

Decided: May 17, 2006.

---

**1.** Pseudonyms have been used to protect the litigants.

Marilyn Martin, Esquire, Department of Justice, Georgetown, DE, for Plaintiff.

Dean Johnson, Esquire, Office of the Public Defender, Georgetown, DE, for Defendant.

## OPINION

HENRIKSEN, Judge.

The Juvenile Defendant was charged with Terroristic Threatening[2] and Hate Crime[3]. At the conclusion of the State's presentation of the case, the defendant moved for a directed verdict. After the Court reserved its decision on the defendant's Motion for Directed Verdict, the defendant proceeded with his own testimony, as well as the testimony of the defendant's mother and stepfather. The Court requested that the parties submit written memoranda to the Court concerning 1) whether the Terroristic Threatening statute was triggered on the facts of the case[4] and 2) whether the words "selects the victim," as used in the Delaware Hate Crime statute, apply to the facts of this particular case.

### FACTS

The defendant is a seventeen-year-old Caucasian and, at the time of this incident, was a student in the Cape Henlopen Career Opportunity Program ("COP") in Lewes, Delaware.[5] The defendant was placed in the COP program on January 5,

2. *See* 11 Del. C. § 621.

3. *See* 11 Del. C. § 1304.

4. The defense specifically argued at trial that, based on Sections 255 (knowledge of high probability) and 262 (intentional or knowing causation) of Title 11 of the Delaware Criminal Code, the Terroristic Threatening statute was inapplicable. The defense, however, abandoned this legal argument and did not advance this legal theory in his written memorandum of law. Instead, the defense provided written argument that the defendant's statements to the victim did not constitute a "true threat."

5. The defendant no longer attends the COP program as of October 26, 2005.

2005 because he was very disruptive at the Cape Henlopen High School, calling a previous teacher a "child molester," a "pedophile," and making inappropriate comments regarding this previous teacher's sexual orientation.

Since his entry into the COP program, he has had the same teacher, Dawn Watson, and the same Behavior Manager [6], Walter Edmunds. Walter Edmunds, an African–American, was the alleged victim in this case. Both Watson and Edmunds testified that they are a "team" and both discipline students who act out in class and impede the learning process. Edmunds specifically testified that while he has the only "discipline title," he and the COP teachers work with the "level system" [7] and address the students' discipline problems together.

On May 19, 2005, the defendant made several racial slurs and derogatory comments to Edmunds, stating "You shouldn't be here, you should go back to Africa," "I don't have to listen to you because you're nothing but a porch monkey," "You are nothing but a fucking nigger," "You have no right to tell me what to do" and "You should be in a field picking cotton," and "I

am smarter than you." This was the first occasion that the defendant made derogatory, race-based comments towards Edmunds. No charges were filed as a result of this incident.

From May 2005 and continuing into the new 2006 school year in September, Watson, a Caucasian, testified that the defendant continued to use profanity often and heard the defendant call Edmunds racial slurs on more than two but less than ten times after this first incident. Both Watson and Edmunds testified that the defendant only made racial slurs towards Edmunds.[8] Watson specifically testified that the defendant's use of racial slurs towards Edmunds "was a pattern of behavior that became more frequent and directed only at [Edmunds]." Watson even testified that the school was willing to overlook the defendant's prior disruptive behavior in an effort to give defendant a chance to continue with his education.[9]

Watson specifically testified that at approximately 8:20 a.m. on October 26, 2005, she asked the defendant to print his schedule and start his daily assignment. Watson testified that the defendant was sitting by the computers in the COP module [10]

**6.** Edwards testified that he has been employed with the Cape Henlopen School District for ten years and for eight of those years he has been a Behavior Manager. Edwards also testified that this position is paraprofessional in nature and he acts as a teacher's aide. While he does have training in using physical restraints and "basket holds," Edwards testified that he does not use these restraints on the high school students in the COP program and only ever used these techniques on the autistic children he has worked with in the past. Edwards testified that only Officer Ostroski physically handles the COP students.

**7.** Under this system, the student is first given a "warning" and then the level of discipline increases to different amounts of "quiet time," in an area separate and apart from the

classroom. This "quiet time" is characterized as a "violation."

**8.** The defendant admitted that he used profanity on a daily basis at school and that he made derogatory racial comments to Edwards on at least two other occasions after May 19, 2005. There was also testimony presented that Edwards was the only African–American teacher in the COP module, but that there was at least one other African–American student in the COP module.

**9.** Edwards also testified that he chose to accept letters of apology from the defendant in the past, as opposed to filing charges with the State.

**10.** This module is located adjacent to the Cape Henlopen High School. *See also* State's

and refused to do his work. At this point, Watson testified that the defendant became increasingly agitated, his voice became very loud, and he would not calm down. Watson testified that she gave the defendant a "two minute violation," which meant that because of his disruptive behavior he had to sit quietly for two minutes. Because the defendant did not remain quiet, Watson testified that he was sent to the classroom where Edmunds was located and the defendant continued to be angry and started yelling, cursing, and making racial slurs towards Edmunds. Watson testified that she stood in the doorway of this room and documented what transpired. Watson specifically testified that she heard the defendant tell Edmunds that he had a gun and an uncle in the mafia who was going to splatter Edmunds' brains all over the wall. She also testified that she heard the defendant tell Edmunds that he had cousins in the KKK who would string Edmunds up in the woods.

Edmunds also testified during the trial and recounted the events that transpired on October 26, 2005. Edmunds testified that Watson gave the defendant a two minute violation and the defendant continued to disrupt the classroom, yelling very loudly and using profanity. Edmunds testified that he came into Watson's classroom and told the defendant to be quiet or he would get another violation. The defendant refused to sit quietly and used more profanity, making comments like "I hate this fucking school," and "this school is a waste of my fucking time." Edmunds testified that because the defendant was not sitting quietly, the defendant was sent to Edmunds' classroom. At this point, Edmunds testified that the defendant said to Edmunds, "You want to fight me?" "I know you are scared of me," "I have cousins in the KKK and a godfather in the mob and we will hang you from a tree," and "I have a shotgun and I will blow your brains out."[11] By this time, Watson had come to the doorway between her classroom and the classroom where Edmunds and the defendant were located and documented the event in accordance with school policy.

Edmunds testified that, while he did not believe that the defendant had a gun on his person at that time, the defendant had previously told him that he had a gun rack in his pickup truck and Edmunds was afraid the defendant would go home, retrieve a gun, and shoot him at a later time. Edmunds also testified that he wrote in the incident report[12] that he told the defendant he was not scared of his threats, but Edmunds testified he said that to the defendant in order to "deescalate the situation" and he really was afraid of the defendant.

Edmunds went on to testify that the defendant left the COP program at 11:00 a.m., since he was a half-day student. After the defendant left school, Edmunds testified that he contacted the school Vice–Principal[13], and because Edmunds was afraid that the defendant may return to school with a gun, the decision was made to contact Officer Ostroski.[14] When Ed-

---

Exhibit 1 which is Watson's depiction of the layout of the module's interior.

11. Edwards testified that the defendant was so loud that he woke up a student who had elected to "clock out" and sleep in Edwards' classroom.

12. *See* Respondent's Exhibit 1.

13. Edwards testified that he contacted the Vice–Principal in accordance with school policy because the Vice–Principal usually decides if such an incident warrants police contact.

14. Officer Ostroski is the Cape Henlopen High School Resource Officer and employed by the Delaware State Police.

munds was questioned why he did not previously file charges against the defendant for prior incidents, Edmunds testified that on previous occasions he felt the defendant was "just venting", but this was the first time the defendant made death threats against him and these threats were not something that he could just ignore. Edmunds testified that on this specific incident he was actually afraid of the defendant and believed the defendant "meant what he said."

The defendant admitted that he told Edmunds that he was going to shoot him with a gun and that the threats he made on this particular day were more "violent" than the comments he made to Edmunds on previous occasions.[15] The defendant, however, testified that he did not intend to shoot Edmunds and he did not have access to a gun when he made these threats on October 26, 2005. He also testified that he did not make these threats because of Edmunds' race and that he only made these comments to Edmunds to get him "out of his face" and "to scare him" so he could leave the defendant alone because he "doesn't like when people tell [him] what to do."

The defendant testified that he chose to "clock out" as soon as he arrived at school on the morning of October 26, 2005. He then testified that he misbehaved and Edmunds gave him the two minute violation, not Watson. The defendant also testified that Edmunds would not let him "clock out" because he was a senior and that was when he told Edmunds "Who are you to tell me what to do?" and he then began using racial slurs and making death threats towards Edmunds. The defendant testified that Edmunds told him that he "could kick [the defendant's] ass," and he

"didn't care about losing his job or about his family." Ms. Watson, although documenting the entire incident, made no mention of the victim—Edmunds—having made any of these statements alleged by the defendant.

Kelly Reed, ("mother") the defendant's mother, was also present at the trial and testified during the proceedings. Mother testified that the defendant "says things without thinking," and he "doesn't hear what he says." She testified that no one in her family is in the mafia or the KKK and that the defendant says things "for shock value." Mother also testified that the defendant has threatened to kill her, has called her a nigger even though she is Caucasian, and has even told her that he called his teacher, Ms. Watson, a "crack whore." Mother admitted that her husband, who is the defendant's stepfather, is a Delaware State Police Officer and he does bring his weapon home, but he locks the gun in a safe and no one except her husband has the combination.

## LEGAL ANALYSIS

*Is Delaware's Terroristic Threatening Statute Triggered On the Facts of the Case?*

Delaware's Terroristic Threatening Statute, located at 11 Del. C. § 621, provides in pertinent part:

(a) A person is guilty of terroristic threatening when he or she commits any of the following:

(1) The person threatens to commit any crime likely to result in death or in serious injury to person or property.

According to the Delaware Supreme Court in *Bilinski v. State,* to establish the

---

**15.** Specifically, the defendant admitted that on one occasion Edwards made a reference to "running" the COP program and the defendants responded that "the only thing [Edwards] runs is up and down the cotton field."

commission of Terroristic Threatening, there must be proof of a threat, to commit a crime, likely to result in death or serious injury to person or property.[16]  A year before the *Bilinski* case, our Supreme Court clearly stated in *Allen v. State* that the Terroristic Threatening statute imposes criminal liability for the use of words.[17] Furthermore, the *Allen* Court held:

> Even if the actor does not intend to actually carry out his threat, the threat itself creates certain identifiable injuries, e.g., mental distress or panic, that the Criminal Code should protect against. Thus, the crime is complete when the actor threatens a crime, the commission of which would reasonably entail death or serious physical or property injury. Whether the threatened act is completed is immaterial.[18]

At trial, the Court was presented with evidence that the defendant made various death threats to the victim and the defendant admitted that he said the following to the victim: "I have an uncle in the mob and cousins in the KKK and they will string you up in the woods," "Your brains will be splattered all over the wall," and other various statements using the word "nigger." While the defendant also admitted that he told Edmunds he would shoot him, the defendant testified that he had no intention or ability to shoot the victim.

In his memorandum of law, the defense argues that the victim was not afraid of the defendant's threats as evidenced by the fact that he did not immediately call the police or believe the defendant had a gun on his person at the time the threats were made.  The defense also cites to federal case law, contending that Delaware's Terroristic Threatening statute is constrained by the right of freedom of speech, as guaranteed by the First Amendment of the United States Constitution.  The defense specifically argues the "determining factor" is whether the defendant's statements constitute a "true threat" under the case of *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), and the defendant's statements were not a "true threat" because the victim "did not take the defendant seriously."  Therefore, the defense argues, the statute is inapplicable.  The State cites to the *Bilinski* and *Allen* cases cited above, contending the crime was completed when the defendant threatened the victim with serious bodily injury.

■  Upon a review of the facts presented in the instant case, it is clear that the Terroristic Threatening statute applies. While the defense may seek refuge under the ambit of the First Amendment, such reliance is misplaced.  In *Watts*, the United States Supreme Court reversed a conviction for violation of a statute prohibiting threats against the President upon concluding that the statement at issue, made at a political rally, was more of a "vehement[ly] sharp attack" against the President rather than a threat.  In so ruling, the United States Supreme Court stated:

> We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term.  For we must interpret the language Congress chose against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement,

---

16.  *See Bilinski v. State,* 462 A.2d 409 (Del. 1983).

17.  *See Allen v. State,* 453 A.2d 1166 (Del. 1982).

18.  *Id.* at 1169.

caustic, and sometimes unpleasantly sharp attacks on government and public officials.[19]

The statements made by the defendant were not made at a political rally, they did not concern a matter of public debate, and they were not made to or about a public figure. The statements cannot even remotely be characterized as "political hyperbole," and the *Watts* case is, therefore, distinguishable from Delaware's case law which unequivocally punishes an actor for the use of threatening words. As the crime of Terroristic Threatening is completed when the actor threatens a crime, the commission of which would reasonably entail death or serious physical injury, the State clearly established more than the necessary factual criteria to survive defendant's Motion for a Directed Verdict.

Moreover, while the defense may argue that Edmunds did not take the defendant's threats "seriously," the evidence presented at trial shows otherwise. Edmunds testified that he was uncertain whether the defendant would return to school with a gun at a later time. Edmunds also testified that unlike previous occasions when the defendant would be "just venting," he believed the defendant "meant what he said this time" and he could not just ignore these threats. Not only did the State's presentation of the evidence merit denial of defendant's Motion for a Directed Verdict, the Court also finds beyond a reasonable doubt that defendant was guilty of the crime of Terroristic Threatening.

*Is Delaware's Hate Crime Statute Triggered On the Facts of the Instant Case?*

■ Delaware's Hate Crime Statute, located at 11 Del. C. § 1304, provides in pertinent part:

(a) Any person who commits, or attempts to commit, any crime as defined by the laws of this State, and who intentionally:

(2) *Selects the victim* because of the victim's race, religion, color, disability, sexual orientation, national origin or ancestry, shall be guilty of a hate crime. For purposes of this section, the term "sexual orientation" means heterosexuality, bisexuality, or homosexuality. (Emphasis added).

A review of the legal memoranda submitted by counsel on the issue framed by the Court shows there is no Delaware case law construing the language "selects the victim." The Court's own independent review of the law corroborates that this portion of the Hate Crime statute has not been developed or examined by our state's judiciary or any other state with a similar statute.

Given the non-existence of legal precedent, both the defense and the State have relied on the literal meaning of the word "selects" in their efforts to advance their respective arguments. Both parties cite to various dictionary definitions. Black's Law Dictionary defines the word "selects" as "to take preference from among others; to pick out. . . ." Webster's New Collegiate Dictionary and American Heritage Dictionary define the word as "to single out," "to pick out," or to "to make a choice."

The defense argues that the defendant did not choose to victimize Edmunds because of his race but, rather, because Edmunds was the "only" disciplinarian present that day. The defense also contends that the defendant's use of the word "nigger" does not implicate the Hate Crime statute because the defendant uses this very derogatory term towards various people, including his own Caucasian mother.

19. *Id.* at 708, 89 S.Ct. at 1401.

The Court first examines the defense's argument that the defendant did not make race-based threats because of Edmunds' race but, rather, because Edmunds was disciplining the defendant. Based upon careful review of the testimony presented at trial, the Court rejects this argument. First, the evidence shows that the defendant previously singled out Edmunds on prior occasions, making derogatory comments and racial slurs towards Edmunds and Edmunds alone in the COP module. Secondly, the evidence indicates that the defendant did not like the fact that an African–American person was disciplining him because he thought that African–Americans were inferior to him, as evidenced by the comments he made before to Edmunds, i.e. stating "You shouldn't be here, you should go back to Africa," "I don't have to listen to you because you're nothing but a porch monkey," "You are nothing but a fucking nigger," "You have no right to tell me what to do," "You should be in a field picking cotton," "Who are you to tell me what to do?" and "I am smarter than you." The defendant had an obvious disrespect and extreme dislike for Edmunds because he was African–American and selected Edmunds as a victim because of his race.

This conclusion is bolstered by the fact that the evidence shows that Watson was present when the defendant was threatening Edmunds, and the defendant never once directed these racially-tainted threats towards Watson, who is Caucasian. While the defense may argue that the defendant "had no choice" but to victimize this African–American individual because he was the "only person" disciplining the defendant that day, contrary evidence was presented at trial. Watson testified that on the day of the incident, the defendant was disrupting the class by talking out. After he refused to quiet down, Watson testified that she—not Edmunds—initially disci-plined the defendant by giving him the original two minute violation. From the evidence presented at trial, it is clear the defendant made a choice not to launch into a verbal assault on Watson who is Caucasian. The defendant did not tell Watson that he was going to shoot her and splatter her brains all over the wall. The defendant did not tell Watson that he was going to string her up from a tree in the woods or have his cousins in the KKK or uncle in the mob find her and hurt her. These statements and others were made to Edmunds, whom the defendant repeatedly called a "nigger," "carpet head," and "porch monkey." The evidence presented at trial reveals that the defendant had repeatedly, for over a year, called Edmunds racial slurs, and on the day of the incident he, again, singled out this particular victim because of his race. From the facts presented at trial, the defendant made unambiguous race-based threats to Edmunds on the day of the incident, as in the past, telling him "You shouldn't be here you fucking nigger," "You should be in Africa," etc. The defendant even admitted at trial that he made a conscious choice to "scare" Edmunds and the particular choice of threats necessarily implies that a "selection" was made by the defendant to terrorize this African–American victim.

Secondly, the defendant's use of the word "nigger" to other people, including his own mother, cannot negate the fact that the defendant committed a Hate Crime against Edmunds. While the defense argues that the defendant calls everyone a "nigger," it is apparent that he did not call Watson or any other person in the module by such a name on the day of the incident. Instead, the defendant selected to call Edmunds, an African–American, a "nigger" and chose to make specific, derogatory racial slurs and death threats exclusively towards Edmunds.

The defense also attempted to persuade the Court that Edmunds should "expect" to be treated this way by virtue of his employment as a behavior manager in a unit that attempts to treat "special needs" children. Defense counsel also offered that there should be a "higher level of acceptance" of the defendant's behavior as he is a "special needs" child. The defense did not present any case law on this argument. The Court takes the time to reiterate that both Watson and Edmunds testified that they had previously heard the defendant use profanity and direct racial slurs to Edmunds. Watson even testified that the school was willing to overlook these other incidents in an effort to give the defendant a chance to continue with his education. Edmunds also testified that he chose to accept letters of apology from the defendant in the past, as opposed to pursuing criminal charges with the State. The events that transpired on October 26, 2006 were, however, the most violent threats made by the defendant towards Edmunds to date and Edmunds testified that he could not ignore the situation. Despite the school's efforts, the defendant continued to be a major disruption with his bad behavior escalating to the point of making death threats towards Edmunds. As there is no "special needs" defense that the Court is aware of, the Court commends the COP program for initially accepting the defendant and attempting to work with him through his behavioral issues for over a year and a half. But on the day in question, the defendant clearly crossed the line of what school teachers need to tolerate. The defendant abused and lost his privilege of obtaining an education at this particular institution. Schools do not have to tolerate a student's criminal conduct even if the student is classified as a "special needs" student.

While Mother may testify that the defendant "says things without thinking," and he "doesn't hear what he says," the defendant admitted that he threatened Edmunds and even testified that he remembered everything that unfolded on the day of the incident. Mother also testified that she recalled the defendant coming home from school on another occasion and telling her that he had called Watson a "crack whore." Based on this evidence, the Court doubts that the defendant does not remember what he says.

For the reasons stated above, the State met its initial burden of demonstrating the necessary elements for a hate crime, and the defendant's Motion for a Directed Verdict is denied. Furthermore, the State proved beyond a reasonable doubt that the defendant is guilty as charged.

## FINDINGS AND CONCLUSIONS

Based upon the foregoing, the defendant's motion for directed verdict on the Terroristic Threatening charge is hereby DENIED. Additionally, the defendant's motion for directed verdict on the Hate Crime charge is hereby DENIED. Furthermore, the defendant is found GUILTY of Terroristic Threatening as well as the Commission of a Hate Crime. Given that the defendant is a minor, the Court hereby adjudicates Joshua Andrews delinquent on both charges, Terroristic Threatening and Hate Crime.[20]

Sentencing will be deferred pending a CAS evaluation.

---

20. *See* 10 Del. C. § 1002.