Joshua ANDREWS, Defendant
Below, Appellant

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 408,2006.

Supreme Court of Delaware.

Submitted: May 23, 2007.
Decided: July 2, 2007.

James T. Wakley, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice:

Defendant-appellant Joshua Andrews[1] appeals his convictions for terroristic threatening and committing a hate crime. Andrews presents two arguments on appeal.

First, Andrews argues that the trial judge erred when he held that the "true threat" doctrine subsumed in First Amendment law only applies to political speech and, therefore, does not protect Andrews from conviction under Delaware's terrorist threatening statute, 11 *Del. C.* § 621. Andrews contends that because no reasonable speaker should have foreseen that Andrews's words would be interpreted as a serious expression of intent to inflict bodily harm, the First Amendment protected Andrews from criminal liability for his speech directed to the complainant, Edmunds.

The interpretation of the "true threat" doctrine is an issue of first impression for this Court. We are called upon to determine whether Andrews uttered a "true threat" to Edmunds. We hold that 11 *Del. C.* § 621 applies only to speech made with a subjective intent to threaten. On the facts here, the First Amendment does not protect Andrews's speech, because Andrews directed a "true threat" to Edmunds with the intent to place Edmunds in fear of bodily harm or death. The trial judge's factual findings to that effect were not clearly erroneous.

Dean C. Johnson, Office of the Public Defender, Georgetown, DE, for appellant.

---

1. We kept the original pseudonyms that Family Court used in its Opinion for consistency purposes. *See* Sup.Ct. R. 7(d). *See also State v. Andrews,* 900 A.2d 156 (Del.Fam.Ct.2006).

Second, Andrews argues that the trial judge misinterpreted and misapplied the hate crime statute, 11 *Del. C.* § 1304(a)(2). He contends that the trial judge misinterpreted the statutory term "select" and erred by determining that Andrews *selected* Edmunds because of his race. Andrews contends that he did not direct his words at Edmunds because Edmunds was African American. Rather, he did so because Edmunds happened to be the person attempting to discipline Andrews at the time he uttered the offending words; therefore, Andrews contends, he did not "intentionally select" Edmunds within the meaning contemplated by 11 *Del. C.* § 1304.

The interpretation of "select" in the hate crime statute is also an issue of first impression for this Court. We interpret "select" to mean that the speaker must both: (1) select the words; and (2) select the person to whom the speaker directs those words. Here, it is apparent that Andrews chose hate filled and racially charged words. He used the word "nigger," and made references to the KKK and to hanging Edmunds from a tree. He also made a threat to "blow [Edmunds's] brains out." Andrews directed those hate filled and racially charged words towards Edmunds knowing he was an African American. At the time when Andrews uttered those words, two individuals were present, one Caucasian and one African American. Andrews chose to direct his derogatory statements solely towards the African American. After considering the record, we hold that there was sufficient evidence for the trial judge to find that Andrews violated the hate crime statute beyond a reasonable doubt.

Accordingly, we affirm Andrews's adjudications of delinquency.

## FACTS AND PROCEDURAL HISTORY

On October 26, 2005, the date of the alleged offense, Andrews was 17 years old. Andrews is a Caucasian male who lives with his. mother, adoptive father, and one sibling, who are also Caucasian. As a child, Andrews had seizures and was "developmentally delayed." Andrews currently suffers from Impulsive Control Disorder and has directed verbal abuse towards others since he was approximately six years old.

Cape Henlopen High School classified Andrews as a conventional student until the close of the school term in December 2004 after Andrews claimed that a teacher was a pedophile and a child molester. As a result of these statements and others, Cape Henlopen High School placed Andrews in the Career Opportunities Program, a special education program for problem students who are disruptive and who use profane and abusive language. COPS is designed to deal with this type of behavior. COPS provides a "Behavior Manager" to work with students when anticipated bad behavior occurs. Walter Edmunds, the complainant, has been a Behavior Manager for the past five years. Edmunds is specifically trained and certified each year in anger management and the use of restraints to deal with students with behavioral problems.

Andrews's incident reports while in COPS date back to the time when he first entered the program. Andrews's first serious confrontation with Edmunds occurred on May 19, 2005. On that date, Andrews made racial slurs to Edmunds, including: "You should be in Africa. You wasn't even supposed to be here. I don't have to listen to—I don't have to listen to you because you're nothing but a porch monkey." Edmunds did not file charges as a result of this incident.

On October 26, 2005, Andrews's teacher in COPS, Dawn Watson, testified that in the morning she gave Andrews his assignments, but Andrews refused to perform. Because Andrews became increasingly agitated and loud after refusing to perform his assignments, Watson gave him a "two minute warning" requiring him to be quiet for that period of time. Andrews refused, and Watson ordered Andrews into a separate, but connected, classroom with Edmunds. Watson stood in the doorway while Edmunds disciplined Andrews.

Edmunds testified that if Andrews did not take the two minute violation, then Andrews's violation would escalate into a "ten minute" violation. Andrews testified that he had "clocked out" immediately after the teacher gave him his assignments. "Clocking out" is a procedure where the student acknowledges that the situation is getting out of hand and that he is not in control and having difficulty. When a student "clocks out," we now understand, the student elects to walk away from a problem.

Andrews, however, continued to use profane language, and he testified that he called Edmunds a "nigger" several times. Andrews stated, "I hate this f'ing school, I hate the f'ing teachers. This school is a big waste of my f'ing time." Andrews then told Edmunds that he had cousins in the Ku Klux Klan, that he had a godfather in the mob and that he would hang Edmunds from a tree. Andrews told Edmunds, "I have a shotgun that I will blow your brains out." Edmunds testified that while he did not believe that Andrews had a gun on his person at that time, Andrews had previously told him that he had a gun

rack in his pickup truck and Edmunds was afraid that Andrews would go home, retrieve a "gun," and shoot him later. Edmunds acknowledged that he wrote in the incident report that he told Andrews that he was not afraid of his threats, but claimed at trial that he said that to Andrews only to "deescalate the situation" and that he really was afraid of Andrews.[2] No one called 911, however, and Andrews left school at 11 a.m., his normal departure time as a half-day student.

At trial, Andrews admitted making the statements to Edmunds, but stated that he never planned to shoot Edmunds, and that he did not have the ability because he neither owned nor had access to a gun. Andrews stated that he uses profanity on a daily basis and that teachers write him up for his language at least every other day. Andrews stated that he usually used profane language towards Edmunds to get Edmunds to leave him alone, and that he used the same type of language on October 26th for that reason.

After Andrews left school on October 26, 2005, Edmunds contacted the vice principal because he was afraid that Andrews might return to school with a gun. The school contacted Trooper Ostrowski, the onsite State Police officer. When asked why Edmunds did not previously file charges against Andrews for earlier incidents, Edmunds testified that on previous occasions he felt like Andrews was "just venting," but this was the first time he believed Andrews to be serious about the death threats and he could not ignore *these* threats.

Some days later, school officials[3] held a meeting and determined that they would

---

2. This was not the first time Andrews used this type of offensive language towards Edmunds.

3. The meeting included Ostrowski; Jake Jefferson, a psychologist for Cape Henlopen High School; Dr. Cannon, the COPS administrator; Edmunds and Watson. Edmunds

file criminal charges against Andrews. On November 9, 2005, police arrested Andrews and charged him with terroristic threatening[4] and commission of a hate crime.[5]

At the close of the State's case, Andrews moved for a directed verdict and the trial judge reserved his decision. At the close of Andrews's case, the trial judge again reserved decision and requested that the parties submit memorandums. The trial judge heard oral argument on May 17, 2006, denied Andrews's motions and found that Andrews had committed both acts of delinquency.[6] The trial judge sentenced Andrews to level V, suspended for one year of level III probation with counseling.[7]

## DISCUSSION

### 1. Terroristic Threatening

Andrews argues that the trial judge erred when he held that the First Amendment did not protect Andrews's speech because the "true threat" doctrine only applies to political speech. He contends that "[a] statement which is not a 'True Threat' is protected by the First Amendment to the U.S. Constitution," regardless of whether the speech is political. Specifically, Andrews contends that no reason-

able speaker "should have foreseen that [Andrews's] words would be interpreted by ... Edmunds as a serious expression of intent to inflict bodily harm" and, therefore, Andrews's words were protected speech under the First Amendment. The State argues that: (1) the true threat doctrine is restricted to political speech, which Andrews's words were not; and (2) even if the true threat doctrine applies, Andrews's words are not protected speech because Andrews intended to utter the words toward Edmunds.

### A. The True Threat Doctrine

The "First Amendment generally prevents government from proscribing speech ... because of disapproval of the ideas expressed."[8] The First Amendment, however, does not protect classes of speech "which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."[9] The United States Supreme Court has held that "true threats" are a class of proscribable speech.[10] In *Watts v. United States*,[11] the United States Supreme Court overturned the conviction of an individual who stated, during a political rally regarding the Vietnam War, "If they ever make me carry a rifle the first man I want to get

made the final decision to file charges against Andrews.

4. 11 *Del. C.* § 621(a)(1).

5. 11 *Del. C.* § 1304(a)(2).

6. *See Andrews,* 900 A.2d 156.

7. The trial judge sentenced Andrews to Division of Youth Rehabilitative Services at Level V for an indefinite period of time, suspended for one year of Level III probation. The conditions of Andrews's probation were that he had to maintain good behavior, participate in anger management programs, and have no contact with Edmunds.

8. *R.A.V. v. St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citations omitted).

9. *Id.* at 382–83, 112 S.Ct. 2538 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)) (quotation omitted).

10. *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

11. *Id.*

in my sights is L.B.J.," because the speech was mere "political hyperbole," not a true threat.[12] The Court analyzed the speech in its context, but did not define what constituted a "true threat." [13]

After *Watts*, federal circuit courts split over the proper test for what constitutes a true threat. On the one hand, the Eighth Circuit, among others, adopted a "reasonable listener" test, holding that a "court must analyze an alleged threat in the light of its entire factual context, and decide whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future." [14] On the other hand, the Third Circuit, among others, adopted a "reasonable speaker" test, holding that a true threat exists when the "defendant intentionally make[s] a statement ... in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the [target]." [15] While each of the above "tests" focuses differently, they can both be viewed as "objective" tests.

The United States Supreme Court's decision in *Virginia v. Black* [16] has created uncertainty over whether courts can still use an objective test to determine whether speech constitutes a "true threat." In *Black*, the Court held that a state could pass a law banning cross burning when there is an intent to intimidate and pass constitutional muster, even though cross burning can be considered a form of speech. The Court described "true threats" as follows:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.[17]

A plurality of the Court, however, held that a jury instruction—stating that the act of burning a cross was itself prima facie evidence of an intent to intimidate—was unconstitutional, because it did not distinguish constitutionally protected speech from unprotected speech.[18]

---

**12.** *Id.* at 707–08, 89 S.Ct. 1399.

**13.** The United States Supreme Court has never limited the true threat doctrine to political speech, and we have no basis for so concluding today.

**14.** *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir.1996) (citations and quotations omitted).

**15.** *United States v. Kosma*, 951 F.2d 549, 557 (3d Cir.1991).

**16.** 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

**17.** *Id.* at 359–60, 123 S.Ct. 1536 (citations and quotations omitted).

**18.** *Id.* at 367, 123 S.Ct. 1536. As the plurality stated:

> The prima facie provision makes no effort to distinguish among these different types of cross burnings. It does not distinguish between a cross burning done with the purpose of creating anger or resentment and a

Courts after *Virginia v. Black* have differed over whether the *Black* test replaces the objective tests with a subjective intent test. One circuit court has questioned the continued validity of an objective test and adopted a subjective test: "[S]peech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." [19] Other courts have read *Black* to be consistent with an objective test. [20]

■ We need not decide which test to adopt, however, because 11 *Del. C.* § 621

applies only to speech made with the subjective intent to threaten. [21] This case is therefore similar to *Virginia v. Black*, which used a subjective intent test where the underlying statute required a subjective intent to intimidate. As we read *Black*, Andrews's speech is proscribable. Andrews directed a threat to Edmunds with the intent of placing Edmunds in fear of bodily harm or death. Under *Black*, as well as 11 *Del. C.* § 621, it is irrelevant that Andrews may not have intended to carry out the threat. [22] Rather, the relevant intent is the intent to threaten or intimidate. [23] Andrews admitted that he

cross burning done with the purpose of threatening or intimidating a victim. It does not distinguish between a cross burning at a public rally or a cross burning on a neighbor's lawn. It does not treat the cross burning directed at an individual differently from the cross burning directed at a group of like-minded believers. It allows a jury to treat a cross burning on the property of another with the owner's acquiescence in the same manner as a cross burning on the property of another without the owner's permission.
*Id.* at 366, 123 S.Ct. 1536.

19. *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir.2005). The court stated:
The clear import of [*Black's*] definition is that only *intentional* threats are criminally punishable consistently with the First Amendment. First, the definition requires that the speaker means to communicate an intent to commit an act of unlawful violence. A natural reading of this language embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim. The Court's insistence on intent to threaten as the *sine qua non* of a constitutionally punishable threat is especially clear from its ultimate holding that the Virginia statute was unconstitutional precisely because the element of intent was effectively eliminated by the statute's provision rendering *any* burning of a cross on the property of another prima facie evidence of an intent to intimidate.
*Id.* at 631 (quotations omitted).

20. *See, e.g., New York v. Cain*, 418 F.Supp.2d 457, 479 (S.D.N.Y.2006) ("The relevant intent is the intent to communicate a threat, not as defense counsel maintains, the intent to threaten.... One need only look at the reasons why threats are proscribable to see why [using the subjective intent test] is misguided. '[A] prohibition on true threats protects individuals from the fear of violence, and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.' ") (quoting *Black*, 538 U.S. at 360, 123 S.Ct. 1536) (citations and quotations omitted); *United States v. Ellis*, 2003 U.S. Dist. Lexis 15543 (E.D.P.A. July 15, 2003) (arguing, among other things: the policy justifications are the same under *Black* and an objective test; *Black* interpreted true threats in the context of a statute that required a subjective intent to intimidate; and intimidating speech is only type of true threat).

21. *See infra* section on terroristic threatening statute. Furthermore, because a subjective intent test is more restrictive than an objective reasonable person test, we may therefore assume that speech satisfying the subjective intent test also satisfies an objective reasonable person test.

22. *Virginia v. Black*, 538 U.S. 343, 359–60, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ("The speaker need not actually intend to carry out the threat.").

23. *Id.* ("True threats encompass those statements where the speaker *means to communi-*

directed his comments to Edmunds to get Edmunds to leave him alone.[24] In other words, Andrews intended to intimidate Edmunds. The evidence suggests that he intended to create the very "fear of violence and the . . . disruption that fear engenders, . . ." proscribable under *Black*. Furthermore, as the situation escalated between Andrews and Edmunds, Edmunds, a disciplinarian with five or six years' experience, testified that he believed Andrews's threats to be real and to have escalated beyond Andrews's past statements.[25]

### B. 11 Del. C. 621

■ Under 11 *Del. C.* § 621(a)(1), a person is guilty of terroristic threatening when he "threatens to commit any crime likely to result in death or in serious injury to person or property." "To establish the commission of Terroristic Threatening, there must be proof of (1) a threat, (2) to commit a crime, (3) likely to result in death or "serious injury" to person or property."[26] Further, § 621 punishes mere words, because the statute is meant to protect against the fear threats engender. An intent to actually carry out the threat is "immaterial."[27] Section 621 does not prescribe the requisite *mens rea* to commit terroristic threatening. 11 *Del. C.* § 251(b) provides that when a statute does not prescribe the *mens rea* required, the State must prove the defendant acted intentionally, knowingly, *or* recklessly.[28] The State argues here that the evidence supports the *mens rea* of intent.[29] The State argues, however, that the only required intent is an intent to utter the words, but that somehow statements "made in jest" or "in mere idle talk" would

*cate a serious expression of an intent to commit an act of unlawful violence to a particular individual. . . .* [A] prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders.") (citations and quotations omitted) (emphasis added).

24. Andrews described the previous incident of May, 2005, as having been diffused when he told Edmunds that "the only thing you run is up and down the rows of the cotton field." Andrews further stated: "I guess it startled [Edmunds] to the point where he left me alone."

25. In stating why he felt this time he thought the threat was real, Edmunds stated:
I felt that I didn't know how to take it. . . . And it was after I felt the actual threatening towards me. Because I mean, usually, when [Andrews] would say things, I always looked at him and said the same things. This time, I felt that he was actually saying them to me. Does that make sense? Said things before, but this time, I really thought that he really meant to do what he was saying to me.

26. *Bilinski v. State,* 462 A.2d 409, 413 (Del. 1983).

27. *Allen v. State,* 453 A.2d 1166, 1168 (Del. 1982) ("The statute imposes criminal liability for the use of words, changing the common law rule that words alone do not constitute an assault. Even if the actor does not intend to actually carry out his threat, the threat itself creates certain identifiable injuries, e.g., mental distress or panic, that the Criminal Code should protect against. Thus, the crime is complete when the actor threatens a crime, the commission of which would reasonably entail death or serious physical or property injury. Whether the threatened act is completed is immaterial.") (citations omitted).

28. 11 *Del. C.* § 251(b) ("When the state of mind sufficient to establish an element of an offense is not prescribed by law, that element is established if a person acts intentionally, knowingly or recklessly.").

29. The State also argued for a mens rea of intent in their Answering Brief. Appellee's Answ. Br. at 10–12 (arguing that Andrews's threat was intentional and "not made in jest," and stating that "the evidence is clear that Andrews *intended* to frighten Edmunds.") (emphasis added).

be excepted. Section 621 cannot be so construed, however, and to do so would be unconstitutional. An "intent to utter the words" interpretation is fundamentally at odds with federal circuit decisions using objective reasonable person and subjective intent tests, and contradicts *Watts'* instruction to consider the speech in context. A "mere intent to utter the words" interpretation would be unconstitutionally overbroad because it would place within the statute's ambit speech that is otherwise constitutionally protected.

■ Therefore, we conclude that § 621 requires that the State prove not only that the defendant uttered words that facially threaten serious physical injury or death but also that in uttering them, the defendant intended to threaten the victim. The defendant need not intend to carry out the threat, but it is not enough to show only that the defendant merely intended to utter threatening words.

■ Here, the trial judge found that Andrews committed terroristic threatening when he threatened to shoot Edmunds.[30] Reviewing the record in context, it appears that Andrews not only intended to speak the threatening words, but also that he intended Edmunds to hear his words as a

threat of serious physical injury or death. Andrews stated that he used profane language towards Edmunds to get Edmunds to leave him alone. Even assuming Andrews's purpose—that he used profanity to shock Edmunds and others into backing off and leaving him alone, weighing the words in context—the trial judge did not err by finding that Andrews intended to intimidate Edmunds by threatening him with serious injury or death. Therefore, we conclude that the trial judge, did not clearly err by finding Andrews delinquent as a result of committing terroristic threatening as defined in 11 *Del. C.* § 621.

## 2. *Hate Crime*

Andrews argues that the trial judge erred by determining that Andrews *selected* Edmunds because of his race under 11 *Del. C.* § 1304. Andrews contends that he did not direct his speech toward Edmunds because Edmunds fortuitously happened to be African American, but rather because he was the person, at that time, attempting to discipline him; therefore, Andrews did not "intentionally select" Edmunds under 11 *Del. C.* § 1304. He also contends that his use of the word "nigger" does not implicate the hate crime statute because Andrews uses this very derogatory term

---

30. The trial judge stated in his denial of Andrews's motion for acquittal:

At trial, the Court was presented with evidence that the defendant made various death threats to the victim and the defendant admitted that he said the following to the victim: "I have an uncle in the mob and cousins in the KKK and they will string you up in the woods," "Your brains will be splattered all over the wall," and other various statements using the word "nigger." While the defendant also admitted that he told Edmunds he would shoot him, the defendant testified that he had no intention or ability to shoot the victim.
* * *
Moreover, while the defense may argue that Edmunds did not take the defendant's

threats "seriously," the evidence presented at trial shows otherwise. Edmunds testified that he was uncertain whether the defendant would return to school with a gun at a later time. Edmunds also testified that unlike previous occasions when the defendant would be "just venting," he believed the defendant "meant what he said this time" and he could not just ignore these threats. Not only did the State's presentation of the evidence merit denial of defendant's Motion for a Directed Verdict, the Court also finds beyond a reasonable doubt that defendant was guilty of the crime of Terroristic Threatening.
*Andrews,* 900 A.2d at 161–62.

towards various people, including his own Caucasian mother. This rather bizarre behavior we are apparently being asked to accept as a mitigating circumstance. Andrews contends, therefore, that the trial judge had insufficient evidence from which he could find that Andrews had committed a hate crime.

The parties have different views regarding this Court's standard of review. Andrews argued that the standard of review for this Court is abuse of discretion. The State argues that the standard of review is, whether viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We review interpretations of law *de novo;* therefore, we first define the meaning of "select" in the hate crime statute under *de novo* review.[31] We then will determine whether there is sufficient evidence in the record to support the trial judge's conclusion that Andrews committed a hate crime beyond a reasonable doubt. "In reviewing a claim for insufficiency of the evidence, the relevant inquiry is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[32] "In doing so, th[is] Court does not distinguish between direct and circumstantial evidence."[33]

Delaware's hate crime statute, 11 *Del. C.* § 1304(a) states, in pertinent part:

> (a) Any person who commits, or attempts to commit, any crime as defined by the laws of this State, and who *intentionally:*
>
> (2) *Selects the victim because of the victim's race,* religion, color, disability, sexual orientation, national origin or ancestry, shall be guilty of a hate crime.[34]

Under 11 *Del. C.* § 1304(b)(2), "If the underlying offense is a class A, B, or C misdemeanor, the hate crime shall be a class G felony." Here, the underlying offense is terroristic threatening, a class A misdemeanor. The trial judge has the discretion to sentence for a class G felony as well as for a class A misdemeanor should he find that Andrews selected Edmunds to be a victim of terroristic threatening because of his race. Therefore, the State must prove beyond a reasonable doubt that Andrews intentionally selected Edmunds because of his race.

The Delaware Code does not define the word "select," and the issue is one of first impression for this Court. Of the 44 states that have invoked hate crime statutes, nine have statutes using language such as "select" or "intentionally select" that are similar to Delaware's statute.[35] The majority of jurisdictions that have reached this issue have determined that

---

**31.** *Patrick v. State,* 2007 WL 773387, at *2 (Del.) (Table).

**32.** *Nelson v. State,* 2006 WL 1061467, at *2 (Del.) (quoting *Murray v. State,* 2005 WL 2219193 at *1, 2005 Del. Lexis 332, at *2–3 (Del.)).

**33.** *Skinner v. State,* 575 A.2d 1108, 1121 (Del. 1990).

**34.** 11 *Del. C.* § 1304 (emphasis added).

**35.** The seven states with "intentional selection" (besides Delaware) are: Hawaii

(HAW.REV.STAT. § 846–51 (2003)), New York (N.Y. PENAL LAW § 485.05(1)(a) (2003)), Rhode Island (R.I. GEN. LAWS § 12–19–38), Tennessee (TENN.CODE ANN. § 40–35–114(14)), Texas (TEX.CODE CRIM. PROC. ANN. art. 42.014 (2001)), Virginia (VA.CODE ANN. § 18.2–57(2) (2007)), and Wisconsin (WIS. STAT. § 939.645(1)(b) (2005)). The states with "selection" are: Louisiana (LA.REV.STAT. ANN. § 14:107.2(A) (2004)) and Maine (17–A ME.REV.STAT. ANN. tit. 17, § 1151(8)(B) (2006)).

there must be a "causal connection" between the crime and the prejudice.[36]

■ The word "select" in the hate crime statute operates in two ways. The speaker must both: (1) select the words and (2) select the person to whom the speaker directs those words. Here, Andrews told Edmunds he had cousins in the Ku Klux Klan, that he had a godfather in the mob, and that he would hang Edmunds from a tree along with the threat that he had a shotgun and would "blow [Edmunds's] brains out." He also called Edmunds a "nigger" various times. Andrews selected specific words that were hate filled and racially charged. Furthermore, he directed those words solely towards Edmunds, an African American. At the time Andrews uttered those words, there were two people standing near him, one Caucasian (Watson) and one African American (Edmunds), and he chose to direct those racially charged words solely to Edmunds. The trial judge's findings, fully supported by the record, underlie our conclusion:

> The Court first examines the defense's argument that the defendant did not make race-based threats because of Edmunds' race but, rather, because Edmunds was disciplining the defendant. Based upon careful review of the testimony presented at trial, the Court rejects this argument. First, the evidence shows that the defendant previously singled out Edmunds on prior occasions, making derogatory comments and racial slurs towards Edmunds and Edmunds alone in the COP module. Secondly, the evidence indicates that the defendant did not like the fact that an African–American person was disciplining him because he thought that African–Americans were inferior to him, as evidenced by the comments he made before to Edmunds, i.e. stating "You shouldn't be here, you should go back to Africa," "I don't have to listen to you because you're nothing but a porch monkey," "You are nothing but a fucking nigger," "You have no right to tell me what to do," "You should be in a field picking cotton," "Who are you to tell me what to do?" and "I am smarter than you." The defendant had an obvious disrespect and extreme dislike for Edmunds because he was African–American and selected Edmunds as a victim because of his race.

> This conclusion is bolstered by the fact that the evidence shows that Watson was present when the defendant was threatening Edmunds, and the defendant never once directed these racially-tainted threats towards Watson, who is Caucasian. While the defense may argue that the defendant "had no choice" but to victimize this African–American individual because he was the "only person" disciplining the defendant that day,

36. *See In re M.S.*, 10 Cal.4th 698, 42 Cal. Rptr.2d 355, 896 P.2d 1365, 1377 (1995); *State v. Stalder*, 630 So.2d 1072, 1076–77 (Fla.1994); *Matter of Welfare of S.M.J.*, 556 N.W.2d 4, 7 (Minn.Ct.App.1996); *People v. Pirozzi*, 237 A.D.2d 628, 656 N.Y.S.2d 42, 44 (1997); *State v. Plowman*, 314 Or. 157, 838 P.2d 558, 561 (1992); *Commonwealth v. Ferino*, 433 Pa.Super. 306, 640 A.2d 934, 938 (1994); *Martinez v. State*, 980 S.W.2d 662, 667 (Tex.Ct.App.1998). Florida and New York have used a slightly different approach; (*See Stalder*, 630 So.2d at 1076 "[t]he statute requires that it is the commission of the crime that must evidence the prejudice; the fact that racial prejudice may be exhibited during the commission of the crime is itself insufficient ... A bias-motivated crime for purposes of this statute is any crime wherein the perpetrator intentionally selects the victim because of the victim's 'race, color, ethnicity, religion, or national origin.'"); (*See also People v. Pirozzi*, 656 N.Y.S.2d at 44; *Matter of John V*, 13 Misc.3d 518, 820 N.Y.S.2d 490 (N.Y.Fam.Ct.2006)). Pennsylvania is one of the few states to overturn a hate crime statute (*See Commonwealth v. Ferino*, 640 A.2d at 938).

contrary evidence was presented at trial. Watson testified that on the day of the incident, the defendant was disrupting the class by talking out. After he refused to quiet down, Watson testified that she-not Edmunds-initially disciplined the defendant by giving him the original two minute violation. From the evidence presented at trial, it is clear the defendant made a choice not to launch into a verbal assault on Watson who is Caucasian. The defendant did not tell Watson that he was going to shoot her and splatter her brains all over the wall. The defendant did not tell Watson that he was going to string her up from a tree in the woods or have his cousins in the KKK or uncle in the mob find her and hurt her. These statements and others were made to Edmunds, whom the defendant repeatedly called a "nigger," "carpet head," and "porch monkey." The evidence presented at trial reveals that the defendant had repeatedly, for over a year, called Edmunds racial slurs, and on the day of the incident he, again, singled out this particular victim because of his race. From the facts presented at trial, the defendant made unambiguous race-based threats to Edmunds on the day of the incident, as in the past, telling him "You shouldn't be here you fucking nigger," "You should be in Africa," etc. The defendant even admitted at trial that he made a conscious choice to "scare" Edmunds and the particular choice of threats necessarily implies that a "selection" was made by the defendant to terrorize this African–American victim.

Secondly, the defendant's use of the word "nigger" to other people, including his own mother, cannot negate the fact that the defendant committed a Hate Crime against Edmunds. While the defense argues that the defendant calls everyone a "nigger," it is apparent that he did not call Watson or any other person in the module by such a name on the day of the incident. Instead, the defendant selected to call Edmunds, an African–American, a "nigger" and chose to make specific, derogatory racial slurs and death threats exclusively towards Edmunds.[37]

Having considered the record, we conclude that the record fully supports the trial judge's finding that the State had established each essential element of a hate crime beyond a reasonable doubt.

### CONCLUSION

For the foregoing reasons, we affirm the judgments of the Family Court.

---

**37.** *Andrews,* 900 A.2d at 163.