J-S45008-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEITH DOMINIQUE GIBSON | : | |
| | : | |
| Appellant | : | No. 375 MDA 2023 |

Appeal from the Judgment of Sentence Entered March 7, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0003230-2021

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                  **FILED: DECEMBER 20, 2023**

Keith Dominique Gibson appeals from the judgment of sentence of two to twenty-three months of incarceration, followed by two years of probation, imposed upon his conviction for stalking.  We affirm.

Given our disposition, we do not extensively reproduce herein the history of this case.  Briefly, in the summer of 2020, Appellant began a romantic relationship with Kent Fullerton and learned that Fullerton previously had been a sexual partner of Victim.  Between early July 2020 and early June 2021, Appellant communicated with Victim directly and indirectly through Victim's wife, by way of phone calls, texts, social media, and in person.  The communications alleged that Victim and his wife were sexual predators who

_____

[*] Former Justice specially assigned to the Superior Court.

lured young men into their home and plied them with alcohol so that Victim could take advantage of them.[1] Appellant also repeatedly threatened to cause Victim physical harm, both personally and through Fullerton's father.

Based upon evidence of these events, a jury found Appellant guilty of stalking on March 7, 2023. The same day, the court sentenced Appellant as indicated above. Appellant filed no post-sentence motion, instead filing a notice of appeal on March 8, 2023. Thereafter, both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following question for our determination:

Was the evidence presented by the Commonwealth insufficient to prove beyond a reasonable doubt that [Appellant] was guilty of stalking pursuant to 18 Pa.C.S. § 2709.1(a)(1) where the evidence was insufficient to prove that [Appellant] acted with the intent to place another person in reasonable fear of bodily injury or to cause substantial emotional distress, most of the speech at issue was protected speech under the First Amendment to the [United States] Constitution and Article 1, [§] 7 of the Pennsylvania Constitution, and [Appellant] did not engage in a course of conduct that conveyed to the victim that such conduct would continue where communication between [Appellant] and the victim ceased in January 2021, and no further communication occurred until [Appellant] saw the victim in public on June [8], 2021[?]

Appellant's brief at 5 (cleaned up).

The following governs our review of Appellant's question:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light

---

[1] Fullerton was twenty-two years old at the time of his relationship with Victim, who was in his early forties. Appellant was in his early thirties during the relevant timeframe.

most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Haahs*, 289 A.3d 100, 104 n.2 (Pa.Super. 2022) (cleaned up).

The section of the stalking statute under which Appellant was convicted provides that a person commits stalking when he "engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person[.]" 18 Pa.C.S. § 2709.1(a)(1). The term "course of conduct" is defined as follows: "A pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct. The term includes lewd, lascivious, threatening or obscene words, language, drawings,

caricatures or actions, either in person or anonymously." 18 Pa.C.S. § 2709.1(f).

Appellant argues that the evidence was insufficient to prove the intent element of the offense, that his communications were protected free speech, and that his various actions did not amount to a course of conduct. *See* Appellant's brief at 10. After a thorough review of Appellant's brief, the Commonwealth's briefs, the applicable law, and the certified record,[2] we agree with the trial court's assessment of the arguments raised by Appellant, and we affirm the judgment of sentence on the basis of the cogent and well-reasoned opinion that Honorable Merrill M. Spahn, Jr., entered on May 8, 2023.

Specifically, Judge Spahn properly held that the Commonwealth's evidence established "that Appellant intended both to place [Victim] in a reasonable fear of bodily injury and to cause [Victim] substantial emotional distress with his course of conduct." Trial Court Opinion, 5/8/23, at 12. *See id*. at 6-10, 12 (detailing Appellant's threatening communications). Indeed, given Appellant's express indications that he would beat Victim "until [he] was unrecognizable," that he could probably kill Victim within four minutes, and that Fullerton's father would render Victim identifiable only by dental records,

---

[2] We note that the certified record does not contain the trial exhibits. However, the trial transcripts contain adequate descriptions of the exhibits, if not verbatim reiteration, such that we are able to conduct our review.

*see* N.T. Trial, 3/6/23, at 104, Appellant's contention that there was no evidence to allow the jury to conclude that he intended to put Victim in fear of bodily injury or to cause them substantial emotional distress is wholly unfounded. Likewise, Judge Spahn correctly determined that the volume and duration of Appellant's threats fell within the statutory definition of a "course of conduct." *See* Trial Court Opinion, 5/8/23, at 14. *See also In re M.J.M.*, 858 A.2d 1259, 1263 (Pa.Super. 2004) ("[A] course of conduct can be based on words alone[.]").

Finally, Judge Spahn properly ruled that Appellant's conduct of repeatedly threatening to physically harm Victim was not constitutionally-protected free speech. *See* Trial Court Opinion, 5/8/23, at 14-15 (citing, *inter alia*, *Interest of: J.J.M.*, 265 A.3d 246 (Pa. 2021)). *See also J.J.M.*, *supra* at 254 (providing that serious expressions of an intent to inflict harm "are not covered by the umbrella of First Amendment protections due to the need to shield individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur").

Accordingly, we conclude that none of Appellant's arguments has merit and affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/20/2023

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CRIMINAL

COMMONWEALTH OF PENNSYLVANIA :
:
v. :          No.    CP-36-CR-0003230-2021
:
KEITH DOMINIQUE GIBSON :

### OPINION PURSUANT TO RULE 1925(a) OF THE PENNSYLVANIA RULES OF APPELLATE PROCEDURE

BY: SPAHN, JR., J.
May 8, 2023

Appellant has filed a timely appeal to the Superior Court of Pennsylvania in the above-captioned matter. Appellant raises a single claim alleging that the evidence presented by the Commonwealth was insufficient to establish Appellant's guilt of Stalking[1] beyond a reasonable doubt. Specifically, Appellant claims that the evidence was insufficient to prove that Appellant acted with intent to place another person in reasonable fear of bodily injury or to cause substantial emotional distress. Additionally, Appellant claims that most of his speech at issue was protected by the First Amendment to the United States Constitution and Article 1, Section 7 of the Pennsylvania Constitution. Lastly, Appellant claims that his actions did not constitute a course of conduct that would convey to the victim that such conduct would continue where communication between Appellant and the victim ceased between January 2021 until June 8, 2021.[2]

---

[1] 18 Pa.C.S.A. § 2709.1(a)(1).
[2] In his Statement of Errors Complained of on Appeal, Appellant erroneously stated that the final date he contacted the victim was June 6, 2021.

1

# Appendix B

## PROCEDURAL BACKGROUND

By Criminal Information docketed to Number CP-36-CR-0003230-2021, Appellant was charged with allegedly having committed the offense of Stalking.[3] Said charge stems from a series of allegedly criminal incidents which occurred between July 16, 2020 through June 8, 2021 in West Lampeter Township, Lancaster County, Pennsylvania.

On October 13, 2021, Appellant filed an Omnibus Pre-Trial Motion seeking to have the charges dismissed for the Commonwealth's purported failure to meet the statutory requirements of the charged crime of Stalking. Appellant further claimed that the charge should be dismissed because to not do so would be a violation of the First Amendment of the United States Constitution and Article 1, Section 7 of the Pennsylvania Constitution. Appellant simultaneously submitted a memorandum in support of his Omnibus Pre-Trial Motion.

On December 13, 2021, the court ordered that a hearing relative to said motion be scheduled for February 10, 2022. This hearing was then re-scheduled for March 10, 2022 following the court granting the Commonwealth's Motion for a Continuance. The hearing commenced on March 10, 2022, but was recessed due to a dispute between parties regarding discovery. Accordingly, the court ordered the hearing resume on April 7, 2022. After the completion of the hearing on April 7, 2022, both parties were given the opportunity to submit written memorandum to support their respective positions.[4] By order dated June 3, 2022, the court ordered that Appellant's motion to dismiss was denied and that the matter be listed for trial.

On August 24, 2022, Appellant filed a motion for a continuance which was denied by a court order dated the next day. On January 9, 2023, Appellant filed a Motion in Limine to Limit

---

[3] 18 Pa.C.S.A. § 2709.1(a)(1).
[4] Having already submitted a memorandum in support of his position when he filed the Omnibus Pre-Trial Motion, Appellant elected not to submit supplemental memoranda. The Commonwealth submitted their Response and Memorandum of Law on May 27, 2022.

2

Course of Conduct Evidence and Request a Pretrial Conference. A pretrial conference was held on February 15, 2023 relative to admissibility issues related to the "course of conduct"[5] evidence. Following the pretrial conference, trial was scheduled for March 6, 2023.

The matter proceed to a jury trial commencing on March 6, 2023 for the sole charge of Stalking. On March 7, 2023, the jury returned a verdict of guilty. (N.T.T. p. 304). In fashioning sentence, the court considered the facts and circumstances of the offense; the comments offered by the Assistant District Attorney, Defense Counsel, and the Appellant; the limited information provided relative to Appellant's background;[6] Appellant's individualized rehabilitative needs, as well as the need for a deterrent and the protection of the entire community; and the applicable sentencing guidelines. *Id.* at 314. Appellant was sentenced to period of incarceration not less than two nor more than twenty-three months followed consecutively by two years of probation. *Id.* at 315.

As noted above, Appellant filed the instant Notice of Appeal on March 8, 2023. By order dated March 10, 2023, Appellant was directed to file a concise statement of errors complained of on appeal. On April 27, 2023, Appellant filed his Statement of Errors Complained of on Appeal. Appellant's sole claim challenges the sufficiency of the evidence presented at trial. The Commonwealth has not filed an Answer thereto. Accordingly. this matter is ripe for disposition.

## FINDINGS OF FACTS

While the following level of detail regarding factual findings may be beyond the scope of the statutory requirement in an opinion pursuant to Rule 1925(a),[7] the court feels obliged in this

---

[5] 18 Pa.C.S.A. 2709.1(a)(1).
[6] Both the Commonwealth and Appellant waived their right to a Pre-Sentence Investigation report. (N.T.T. p. 307).
[7] Pennsylvania Rule of Appellant Procedure 1925(a).

3

matter to present a more complete story of the relationships, and their respective interplay, underlying the criminal conduct in this matter.

Keith Gibson (Appellant) is a thirty-three-year-old man who at the time of the alleged incidents lived in Frederick, Maryland. (N.T.T. pp. 237-41). Nathan Claycomb ("Claycomb") is forty-four years old, has been married to his wife Denise for seventeen years, together they have two sons, and at the time of the alleged incidents lived at 1124 Hampden Drive, Strasburg, Lancaster County, Pennsylvania. *Id.* at 96-97, 212. Kent Fullerton is a twenty-six-year-old man who at the time of the alleged incidents resided with his parents at 1211 Church Road, Manchester Township, York County, Pennsylvania. *Id.* at 214, 260, C. Ex. 1.

In 2019, Claycomb worked for Servant Stage and Denise worked at Nathan's previous place of employment, Sight and Sound Theatres.[8] *Id.* at 84, 111. Fullerton worked as a senior artist at another theatre organization located in Lancaster County, American Music Theatre. *Id.* at 215. Sharing a professional interest in theatre, Claycomb and Fullerton became friends through another Sight and Sound employee, Eli Drawk. *Id.* at 200, 216. This friendship grew over the course of 2019, leading to Fullerton's repeated presence in the Claycombs' home, shared meals, and various social activities inside and outside the home. *Id.* at 138, 226-27.

On June 30, 2019, a twenty-two-year-old Fullerton accompanied the Claycombs and their younger son on a vacation to Ocean City, Maryland. *Id.* at 97, 144. That night, Claycomb and Fullerton shared the bed while Denise and the Claycombs' son shared the pull-out couch, with a curtain drawn between the two pairs. *Id.* at 218. That night, Claycomb and Fullerton's relationship turned sexual, as they engaged in the sexual touching of each other's genitalia. *Id.* at 203. This began an affair between Claycomb and Fullerton that included at least ten to fifteen more sexual

---

[8] Both Servant Stage Company and Sight and Sound Theatres are theatre organizations located in Lancaster County. Sight and Sound Theatres is a Christian organization that performs Biblical scenes as dramatic plays.

4

encounters over a period of several months in 2019. *Id.* at 219. Both being of legal age, these sexual encounters were routinely preceded by Claycomb and Fullerton mutually imbibing alcohol, often engaging in mixology during their social interactions or sharing meals at which alcohol was served. *Id.* at 220.

By 2020, the affair began to reach its end, especially with the onset of the Coronavirus pandemic in March of 2020. *Id.* Claycomb and Fullerton had intermittent contact via text messages and social media in the spring of 2020, and Fullerton visited the Claycombs to commiserate at Denise's mother's home following her father's passing in March of 2020. *Id.* at 200.

It was also in March of 2020 that Fullerton met Appellant through Appellant's sister. *Id.* at 221. Fullerton and Appellant immediately grew close, and both considered themselves to be dating by late May to early June of 2020. *Id.* at 221, 238. In May 2020, Claycomb sent a text message to Fullerton while Fullerton was with Appellant. *Id.* at 239. Fullerton and Appellant crafted a reply message to Claycomb that Fullerton was no longer in a position to communicate with Claycomb and that he would let Claycomb know if that changed. *Id.* at 98, 228. In June of 2020, Claycomb left Fullerton an unanswered voicemail. *Id.* at 221.

In early July of 2020, Claycomb sent an e-mail to Fullerton containing a picture of an envelope addressed to Fullerton at his parent's address containing an apology letter from Claycomb to Fullerton for stepping back from their relationship. *Id.* at 99. Fearful that Fullerton would not wish his parents to intercept the letter, Claycomb sent a picture of the envelope with the attached message, "I'd like to send you this, but I don't think you would want it going to your parents. Is this the best address?" *Id.* at 223.

Prior to July 16, 2020, neither Nathan nor Denise Claycomb had ever heard of, spoke to, or even about knew the existence of Appellant or his relationship with Fullerton. *Id.* at 76, 101.

5

In the evening of July 16, 2020, Denise, who at this point was unaware of her husband's homosexual inclination and his affair with Fullerton, received a voicemail from an enraged Appellant.[9] *Id.* at 77. In that voicemail, Appellant informed Denise that Claycomb had engaged in sexual activities with Fullerton and Drawk behind her back, that one of those sexual encounters between Fullerton and Claycomb happened with her in the room during the aforementioned vacation to Ocean City, Maryland, and, referring to the letter, that Claycomb must stop attempting to contact Fullerton, otherwise Appellant would "beat his fucking ass" "like someone should have done a long time ago." (N.T.T. C. Ex. 1). Appellant also accused Denise of helping Claycomb "liquor up" young men "to abuse them." *Id.* This voicemail was immediately followed by a string of text messages from Appellant to Denise reiterating that Appellant viewed Claycomb as a predator who "preys [o]n young boys" and that when Appellant catches Claycomb "his ass is mine." (N.T.T. C. Ex. 2). At this time, Claycomb was at a nearby Rutter's convenience store and received a text message from Denise to return home. (N.T.T. p. 100). Claycomb returned home and listened to the voicemail Appellant left Denise. *Id.*

After listening to the voicemail, Claycomb received two calls from Appellant, at 7:11 p.m. and 7:54 p.m., and answered both times. *Id.* at 102. The first call lasted twenty-three minutes and the second lasted twenty minutes. (N.T.T. C. Ex. 5). In these phone calls, Appellant informed Claycomb that he was currently dating Fullerton, that he knew Claycomb and Fullerton had had a sexual relationship prior, that he intended to inform anyone he could that Claycomb was a closeted gay man, and that he intended to physically assault Claycomb should the two ever meet in person. *Id.* at 104. Further, Appellant threatened to inform Fullerton's father of the affair, claiming that if Fullerton's father found out about the affair that he would harm Claycomb to a degree that he

<hr />

[9] Denise observed the call incoming but, not knowing the number, decided not to answer it. (N.T.T. p. 76).

6

would only be recognizable by dental records. *Id.* Lastly, claiming that the courts go easy on those who murder predators, Appellant informed Claycomb that the average response time of an ambulance is seven minutes and Appellant could probably kill him in four minutes. *Id.*

At 8:21 p.m. that same evening of July 16, 2020, following their phone conversations, Appellant began texting Claycomb ordering him to remove any social media posts containing Fullerton from his accounts, to which Claycomb complied. *Id.* at 107-08. These text messages went back and forth late into the night and continued the next day, including a message from Appellant to Claycomb claiming that Appellant had recorded their phone conversations in which Claycomb admitted to his affairs with Fullerton and Drawk and threatened to release it should he feel that Claycomb attempted to "victim shame." *Id.* at 107-109. This text message chain ended in the early afternoon of July 17, 2020 with Appellant accusing Claycomb of contacting a mutual friend of Claycomb's and Fullerton's and trying to shift the blame to Fullerton, which Claycomb did not do and denied doing in his response to Appellant. *Id.* at 109.

On July 31, 2020, Appellant sent screenshots of Claycomb's Facebook posts to Claycomb via text message reiterating that all of Claycomb's posts that contain or refer to Fullerton are to be removed from his social media accounts. *Id.* at 110.

On August 7, 2020, both Nathan and Denise Claycomb received more text messages from Appellant. *Id.* at 83, 118. Appellant informed Denise that he had spoken with Human Resources at Sight and Sound and relayed his accusations of "predatory behavior." (N.T.T C. Ex. 3). Appellant also sent Denise a picture of a letter addressed to Denise's mother threatening to relay his accusations to her. *Id.* In his messages to Claycomb, Appellant accused Claycomb of "making up lies" about him and harassing Fullerton. (N.T.T. C. Ex. 8). When Claycomb informed Appellant that he had no idea what he was talking about, Appellant began calling, texting Claycomb to "be

7

a man and pick up the phone," and saying that if he did not pick up the phone, he would come to Claycomb's home. *Id.* Claycomb did pick up the phone for a short conversation that consisted mostly of Claycomb informing Appellant that he would be getting a lawyer. (N.T.T. p. 120). Appellant ended the chain of text messages with another threat to tell Fullerton's father about the affair between Fullerton and Claycomb and a threat from Appellant that "there are so many people that would love nothing more than to get their hands on you." (N.T.T. C. Ex. 8). Two days later, Appellant texted Claycomb once to inform him that Fullerton's entire family, father included, now knows about the affair. *Id.*

In the span of those two days, on August 8, 2020, an Instagram account was set up under the profile name "exposingpapredators." (N.T.T. C. Ex. 12). This account contained only one post, a screenshot of the text messages between Appellant and Claycomb from Appellant's phone, tagging both of the Claycombs' places of employment and their hometown. *Id.* That same day, from a phone number created using Google, Appellant texted a screenshot of the Instagram account and adjoining post to Claycomb with a text that read, "You and Denise are going to be instagram famous now!!!" (N.T.T. C. Ex. 13). Also, that same day, that new Instagram account commented on Claycomb's Instagram post from that day which quoted the Bible, with the comment, "He probably also said be faithful to your wife and not get young men drunk so you can have sex with them in your house while your wife and kids are asleep!" (N.T.T. C. Ex. 14).

It was at this point that the Claycombs decided to seek legal assistance. (N.T.T. p. 120). The Claycombs hired an attorney to issue and serve a cease-and-desist letter to Appellant ordering him to have no more contact with them directly or indirectly, and to not enter onto their property.[10]

---

[10] The cease-and-desist letter also informed the court that at some point Appellant had contacted Pennsylvania Children and Youth in an attempt to have the Claycombs be deemed unfit parents to their two sons. (N.T.T. C. Ex. 7).

(N.T.T. C. Ex. 7). This cease-and-desist letter was served on Appellant on August 13, 2020. (N.T.T. C. Ex. 10).

In September of 2020, Appellant sent a Facebook friend request to Denise Claycomb. (N.T.T. C. Ex. 4).

In October 2020, another Instagram account was set up under the profile name "user063019"[11] and bio that read "What is done in the dark shall come to the light!" (N.T.T. C. Ex. 15). This Instagram account only had two posts, and one was the same screenshot of text messages used in the sole post of the "exposingpapredators" account. *Id.* The other post contained a screenshot of different messages between Appellant and Claycomb, also taken from Appellant's phone. *Id.*

In January 2021, a Facebook account was created name "SaveOur YoungMen." (N.T.T. p. 147). This account commented on a post of Angie Vertucci, a friend of the Claycombs. *Id.* The comment read,

> "You should be aware of who your 'friend' Nathan Claycomb is. Here's a screenshot of him admitting to not ONE but TWO sexual relationships with young men in the last year. Nathan and Denise are sexual predators who invite young men into their home to 'babysit' then gain their trust only to serve them large amounts of alcohol and suggest that the young men sleep in their marital bed with them so Nathan can grope them. This even happened while their children are in the room. Servant Stage fired Nathan for this and Sight & Sound was notified that Denise was aware of Nathan's sexual relationship with one of their young male employees. They are seriously disturbed individuals."

(N.T.T. C. Ex. 16). The comment included the same screenshot contained in posts of both the aforementioned Instagram accounts. *Id.*

Finally, in the morning of June 8, 2021, Claycomb went to his 11 a.m. workout appointment with his personal trainer at the Planet Fitness located in Kendig Square, Willow

---

[11] The date of the initial sexual encounter between Claycomb and Fullerton was June 30, 2019, or 06/30/19.

Street, Lancaster County, Pennsylvania. (N.T.T. p. 173). As Claycomb was walking through the parking lot from his car towards Planet Fitness, Appellant pulled up beside Claycomb in a white SUV and said, "Hey, buddy!" *Id.* at 174. As this was the first time Claycomb had ever met Appellant, he did not recognize him until Appellant removed his sunglasses and began yelling at Claycomb about having sex with younger men. *Id.* Immediately, Claycomb continued walking into Planet Fitness and began calling 9-1-1. *Id.* Appellant then drove his car in reverse through the parking lot, parked in front of Planet Fitness, and followed Claycomb into Planet Fitness on foot. *Id.* at 176. Inside, Appellant began shouting, "This is Nathan Claycomb! He and his wife are sexual predators! They get men drunk and have sex with them in their marital bed!" (N.T.T. C. Ex. 17). Appellant was shouting so loud that Claycomb had a hard time communicating with the 9-1-1 operator while in Planet Fitness. (N.T.T. p. 177). Simultaneously, Appellant had his phone out and was video recording the entire encounter inside Planet Fitness. *Id.* Unable to hear the 9-1-1 operator, Claycomb returned to his car and reported the incident to the police, and Appellant left the shopping center parking lot. *Id.* [12]

In the days immediately following the confrontation, Appellant posted a series of Instagram stories on his personal account referencing the Planet Fitness incident and his ongoing crusade against Claycomb. (N.T.T. C. Ex. 19, ("YOU'RE THE PREDATOR RIGHT UP UNTIL YOU'RE THE PREY")); (N.T.T. C. Ex. 20, (Contains a picture of the Planet Fitness, of which Appellant is not a member (N.T.T. p. 194), with the caption, "TIME TO WORK OUT" )); (N.T.T. C. Ex. 21, ("SCREEN SHOTS, EMAILS, TEXT MESSAGES, VOICEMAILS AND AUDIO

---

[12] At trial, when asked why he was at the Kendig Square shopping center at 11 a.m. on a Tuesday when he lived and worked in Frederick, Maryland, Appellant answered that he was visiting Fullerton and was simply going grocery shopping at the Weis Supermarket also located in the shopping center and fortuitously happened to spot Claycomb as he was walking through the parking lot. (N.T.T. p. 247). Despite this proffered explanation for his presence, neither before nor after their confrontation, Appellant did not step foot in the Weis Supermarket that day. *Id.* at 250.

RECORDINGS. When you have the screenshots that could ruin someone's life: TRY ME IF YOU WANT TO!")); (N.T.T. C. Ex. 22, ("REMEMBER THAT TIME GARY PLAUCHE SHOT THE PREDATOR THAT PREYED ON HIS SON, LIVE ON NATIONAL TV . . . AND ONLY GOT PROBATION AND COMMUNITY SERVICE.")).

## DISCUSSION

As noted, Appellant's sole allegation of error pertains to his claim that the evidence presented at trial was insufficient as a matter of law to sustain his conviction of Stalking.[13] Specifically, Appellant contends that the evidence was insufficient to show: that he intended to place another person in reasonable fear of bodily injury or to cause substantial emotional distress; that most of his speech at issue was not protected under the First Amendment of the United States Constitution and Article 1, Section 7 of the Pennsylvania Constitution; and that he engaged in a course of conduct that conveyed to the victim that such conduct would continue.

### I. Sufficiency of Evidence

A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review under a *de novo* standard. *Commonwealth v. Smith*, 234 A.3d 576, 581 (Pa. 2020). In reviewing Appellant's challenge to the sufficiency of the evidence, the appellate courts need view the evidence produced at trial in the light most favorable to the Commonwealth as verdict winner to determine if it is sufficient to allow a reasonable jury to find each element of the offenses charged beyond a reasonable doubt. *Commonwealth v. Slocum*, 86 A.3d 272, 275 (Pa. Super. 2014).

> The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated, and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the

---

[13] 18 Pa.C.S.A. § 2709.1(a)(1).

11

weight of the evidence produced is free to believe all, part or none of the evidence.

*Id.*

For Appellant to prevail on his claim that the evidence is insufficient, it must be said that accepting all the evidence and all reasonable inferences drawn from the evidence upon which, if believed, the verdict could properly have been based, that the evidence would be insufficient in law to find beyond a reasonable doubt that he is guilty of the crime charged. *Commonwealth v. Meadows*, 369 A.2d 1266, 1268 (Pa. 1977); *See also Commonwealth v. Quel*, 27 A.3d 1033, 1037-38 (Pa. Super. 2011). "It is axiomatic that "[b]eyond a reasonable doubt" has never been construed to equate to 'beyond all doubt.'" *See Commonwealth v. Jones*, 858 A.2d 1198, 1201-04 (Pa. Super. 2004).

The Pennsylvania Crimes Code defines the crime of Stalking, 18 Pa.C.S.A. § 2709.1(a)(1), as follows: § 2709.1 Stalking

> (a) Offense defined. – A person commits the crime of stalking when the person either:
>> (1) engages in a course of conduct or repeatedly commits acts towards another person, including following the person without proper authority, under circumstances which demonstrate an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress in such other person; or
>> (2) engages in a course of conduct or repeatedly communicates to another person under circumstances which demonstrate or communicate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person.

18 Pa.C.S.A. § 2709.1.

In viewing the totality of Appellant's actions, the court reaches the inescapable conclusion that Appellant intended both to place Claycomb in a reasonable fear of bodily injury and to cause Claycomb substantial emotional distress with his course of conduct.

12

From the inception of communication between Appellant and the Claycombs, Appellant has threatened to physically assault Claycomb should he contact Fullerton again, should he attempt to explain his side of the story to mutual friends of his and Fullerton's, or should he happen to cross paths with Appellant in everyday life. (N.T.T. p. 104, threatening that even if he saw Claycomb in downtown Lancaster City with his wife and sons that Appellant would beat him). Appellant threatened to send Fullerton's father after Claycomb, asserting, as mentioned above, that Claycomb would only be recognizable by dental records should that come to fruition. Appellant even stated the time he estimated it would take to kill Claycomb before an ambulance could arrive.

Appellant's intent to place Claycomb in reasonable fear of bodily injury pales only in comparison to his intent to cause Claycomb substantial emotional distress. Over the course of twelve months, Appellant, having never even met Claycomb, threatened to physically harm Claycomb himself and/or with the aid of Fullerton's father; contacted the employer of Claycomb and his wife to level his accusations in an attempt to deprive them of their livelihood;[14] threatened to send a letter to Denise Claycomb's mother leveling his accusations and outing Claycomb's homosexual affairs; contacted Pennsylvania Children and Youth in an attempt to have the Claycombs' be deemed unfit parents; sent a Facebook friend request to Denise Claycomb following service of the cease-and-desist letter; had a hand in, if not was the sole actor in, the creation of three different social media accounts that publicly accused the Claycombs of predatory behavior, targeting close friends of the Claycombs with comments and tagging the Claycombs' hometown and places of employment; [15] and, lastly, confronted Claycomb in public unprompted,

---

[14] Claycomb actually was forced to step down from his position at Servant Stage following Appellant contacting the theatre organization and accusing Claycomb of predatory behavior. (N.T.T. p. 149).

[15] At trial, Appellant denied participation in the creation of the social media accounts, (N.T.T. p. 246), but by his own admission in his Statement of Errors Complained of on Appeal, the January 2021 Facebook account was of his

13

followed him into Planet Fitness, and screamed his accusations of predatory behavior in an attempt to ruin Claycomb's reputation within yet another sphere of his private life.

Given the volume, duration, and egregious nature of Appellant's course of conduct against Claycomb, there is no merit to the claim that Appellant's actions did not convey to Claycomb that such conduct would continue.

In light of the foregoing, Appellant has failed to demonstrate that the evidence was insufficient in law to sustain his conviction in the instant matter. As such, Appellant's claim must fail.

## II.    First Amendment

The First Amendment of the United States Constitution and Article 1 Section 7 and 20 of the Pennsylvania Constitution protect the rights of persons to free speech. The right of free speech is fundamental to our legal system and national identity. Therefore, the factual issues as to the alleged criminal conduct and intent of the defendants must be judged with the greatest of care. However, the United States Supreme Court and our own Pennsylvania Supreme Court have made it clear that these rights are not unlimited. Indeed, additional categories of offenses that criminalize speech – including solicitation, extortion, and other speech "integral to criminal conduct" – have been deemed to pass constitutional muster. *See United States v. Williams*, 553 U.S. 285, 128 S.Ct. 1830 (2008); *United States v. Hobgood*, 868 F.3d 744 (8th Cir. 2017); *In the Interest of J.J.M.*, 265 A.3d 246 (Pa. 2021) (noting that child pornography, fraud, true threats, and other speech "integral to criminal conduct" are not immunized from prosecution under the First Amendment) (citation omitted). In addition, our Supreme Court has upheld a criminal statute prohibiting harassment by unwanted, repeated communications in the face of a First Amendment challenge,

_____

own doing. That Facebook account posted the same screenshot of messages that was contained on both of the related Instagram accounts.

noting that the state has a legitimate interest in preventing harassment and that the offense was directed at harassing conduct rather than the speech itself. *See Commonwealth v. Hendrickson*, 724 A.2d 315 (Pa. 1999).

Viewed in its totality, the court concludes that Appellant's conduct falls outside the bounds of constitutionally protected speech. The communications were clearly intended to be physically and emotionally threatening, defamatory, and distress-inducing. Claycomb is not, by any account, a public figure in the town in which he lives, and the communications related to matters that are not of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 452 131 S.Ct. 1207 (2011) ("Not all speech is of equal First Amendment importance, [] and where matters of purely private significance are at issue, First Amendment protections are often less rigorous.") (brackets and quotation marks omitted). It is not the content of Appellant's speech that removes it from First Amendment protection, but the manner in which he weaponized it that forfeits all constitutional protection. As such, Appellant's claim that his conduct falls within the protections of the First Amendment and, therefore, the conviction against him in the instant matter cannot be sustained must also fail.

## CONCLUSION

Accordingly, for the reasons set forth above, the court concludes the sole ground identified by Appellant in his Statement of Errors Complained of on Appeal Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) lacks merit and respectfully requests that the instant appeal be DENIED.

BY THE COURT:

_____
MERRILL M. SPAHN, JR., JUDGE
May 8, 2023

**Attest:**

Copies to:     Caitlin B. Blazier, Esquire, Assistant District Attorney
Diana C. Kelleher, Esquire, Assistant Public Defender

16